

**NUMBER 13-09-00395-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI ‑ EDINBURG

---

**JOSE ALONZO,**                                                                                          **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                                                 **Appellee.**

---

**On appeal from the Criminal District Court
of Jefferson County, Texas.**

---

# O P I N I O N

**Before Chief Justice Valdez and Justices Yañez and Garza
Opinion by Chief Justice Valdez**

Appellant, Jose Alonzo, was indicted on one count of murder, a first-degree felony, *see* TEX. PENAL CODE ANN. § 19.02(b)(1), (c) (Vernon 2003), and one count of possession of a deadly weapon in a penal institution, a third-degree felony. *See id.* § 46.10(a)(2), (d) (Vernon 2003). A jury convicted Alonzo of the lesser-included offense of manslaughter, a second-degree felony, *see id.* § 19.04 (Vernon 2003), as well as the offense of

possession of a deadly weapon in a penal institution. After finding an enhancement allegation "true," the jury sentenced Alonzo to twenty years' imprisonment for each offense and ordered the sentences to run consecutively.[1] By six issues, Alonzo contends that: (1) the trial court erred by instructing the jury that the justification of self-defense does not apply to the lesser-included offense of manslaughter; (2) the evidence is legally and factually insufficient to prove that he committed manslaughter; (3) the evidence is legally and factually insufficient to prove that he committed the offense of possession of a deadly weapon in a penal institution; and (4) the trial court erred by denying his motion for new trial in which he alleged that members of the jury had engaged in misconduct. We affirm the trial court's manslaughter judgment, and we affirm as modified the trial court's judgment regarding the offense of possession of a deadly weapon in a penal institution.[2]

## I. BACKGROUND

On June 30, 2006, an altercation arose between Alonzo and Victor Rocha, two "close custody" inmates imprisoned in Building 8, K-pod, Section 2 of the Texas Department of Criminal Justice Institutional Division's Stiles Unit located in Jefferson County, Texas.[3] During the incident, Rocha sustained injuries and died of a stab wound

---

[1] Alonzo's sentences were enhanced by a capital murder conviction for which he was serving a life sentence at the time the two additional offenses are alleged to have been committed. Although the manslaughter and possession of a deadly weapon in a penal institution sentences were ordered to run consecutively with respect to each other, they were ordered to run concurrently with Alonzo's previous life sentence.

[2] Two judgments appear in the record—one relating to manslaughter, which refers to section 19.04 of the Texas Penal Code, and one relating to possession of a deadly weapon in a penal institution. *See* TEX. PENAL CODE ANN. §§ 19.04, 46.10 (Vernon 2003). The trial court's judgment regarding the offense of possession of a deadly weapon in a penal institution mistakenly refers to section 19.04 of the penal code instead of section 46.10. *See id.* § 46.10. Because we have the necessary data and evidence for reformation, we modify the trial court's judgment to reflect the correct statute for the offense of possession of a deadly weapon in a penal institution. *See id.*; *see also* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993).

[3] Trial testimony revealed that "close custody" inmates experience heightened security regulations. Building 8, K-pod, Section 2, consists of three floors of inmate cells. Each cell is secured by a solid "gate," or door, that has a small window and tray slot. Each cell, when unlocked, opens into a narrow hallway

2

to the chest.

## A. State's Evidence

Officer Roger Whittley, the only correctional officer on duty in Section 2 at the time of the incident, testified that he released Alonzo from his cell and led him to a nearby inmate shower stall sometime around 10:00 p.m. on the night of the altercation. Officer Whittley did not perform a pat-down or a full-body search of Alonzo before releasing him from his cell, which was located on the second floor of Section 2. Without being handcuffed, Alonzo was led to and locked in an individual shower stall located on the second floor near his cell.

Officer Whittley stated that Rocha, who had been released from his cell to move to another cell, "roamed" around the three floors of Section 2 while Alonzo showered. Shortly before Alonzo was released from the shower, Rocha was seen standing in the stairwell of the second floor. After a short time, Officer Whittley released Alonzo from the shower stall. Alonzo emerged from the shower stall wearing only a pair of boxers and a towel around his neck; a full body search was not performed. Rocha moved from the stairwell and met Alonzo shortly before Alonzo reached his cell. Officer Whittley heard Alonzo and Rocha shouting in Spanish. Officer Whittley then saw the two men "collide" and "wrestle each other." On cross-examination, after viewing a surveillance video, Officer Whittley stated that Rocha appeared to have extended his arm and initiated the contact with Alonzo. As Alonzo and Rocha fought, Officer Whittley saw a "shank" made of a piece of brown metal in Alonzo's hand.[4] Officer Whittley did not see a "shank" in Rocha's hand; however, he testified that at the beginning of the fight, Rocha possessed "some type of cord."

---

overlooking a large room where the inmates of Section 2 eat their meals. Each level contains eight cells, and each cell houses two inmates. Showers and stairwells are positioned at the end of each hallway.

[4] Trial testimony defined a "shank" as a "penitentiary kind of knife" used to inflict injury upon another.

Officer Whittley testified that the fight ended when Alonzo thrust the brown metallic "shank" towards Rocha. Alonzo and Rocha separated, and Rocha ran past Officer Whittley holding his chest and saying that he had "been hit." Rocha then fell to the ground bleeding. Meanwhile, Alonzo returned to his cell and "demanded" that he be allowed to enter it. Officer Whittley stated that Alonzo then passed the "shank" through a cell door. Soon after, Alonzo was handcuffed and led away from the cell area. While being led away, Alonzo shouted "obscenities" in English and Spanish to Rocha. Officer Christopher Moore recalled that Alonzo yelled something to Rocha "[a]long the lines of, I hope you die, motherfucker. You get what you deserve . . . ." No brown metallic object or any type of "shank" was recovered after the altercation.

Forensic pathologist Dr. Tommy Brown, testified that he performed an autopsy examination on Rocha. Dr. Brown stated that a stab wound inflicted by a deadly weapon caused Rocha's death. On cross-examination, Dr. Brown testified that he found no defensive wounds on Rocha's body.

Alonzo's cellmate, James Woolridge, testified that he heard a conversation between Alonzo and Rocha approximately a week and a half before the altercation. Woolridge stated that during the conversation, Alonzo told Rocha that Rocha was "disrespecting [Alonzo] and his gang" and "needed to pack [Rocha's] property and move off the wing and show [Alonzo] some respect." According to Woolridge, Alonzo indicated that he would kill Rocha if Rocha did not move to a different prison wing.

When questioned about Alonzo's gang affiliation, Woolridge testified that Alonzo told him that he was in a "Mexico gang." Woolridge also stated that Alonzo "often" carried a "shank." When asked how Alonzo would carry the "shank," Woolridge replied, "He would

4

lift up his big-old fat belly, stick the weapon up under his belly and let his belly go and his belly would hold the weapon down."

Woolridge stated that on the night in question, he was inside the cell that he shared with Alonzo. Woolridge did not witness the altercation; however, he stated that after the fight ended, Alonzo came to the cell door and attempted to pass him a "knife." Woolridge testified that Alonzo requested that he "tear it up, destroy it, and flush it down the toilet." Woolridge testified that he refused to comply with Alonzo's request. Woolridge stated that the "shank" that he had "often" seen Alonzo carry could have caused Rocha's fatal wound.

Rocha's cellmate, Michael Martinez, also testified. Martinez testified that he and Rocha were members of the "Mexican Mafia" gang. Martinez stated that Alonzo was a member of a gang known as the "Partidos Revolucionarios de Mexicles" ("PRM"). According to Martinez, Rocha was involved in an altercation with a PRM member a "couple of days" before Rocha's fight with Alonzo. Martinez claimed that Alonzo and Alonzo's friend and fellow PRM member, Armando Alvarado, indicated that they planned to kill Rocha. Martinez testified that after learning this information, he feared for Rocha and gave Rocha a "shank" made of a sharpened eight-to-ten-inch piece of chainlink fence. After viewing a photograph of Rocha's fatal stab wound, Martinez stated that the size and shape of the "shank" that he gave to Rocha was not consistent with the wound.

**B.    Defense's Evidence**

Ricky Davis, an inmate housed in the same building as Alonzo on the night in question, testified that he witnessed the altercation between Alonzo and Rocha after being awakened by the commotion outside of his cell. Davis stated that he did not see the beginning or the end of the fight. However, after he woke up, Davis looked out of his cell's

5

window and saw Alonzo and Rocha "fighting" and "wrestling." Davis saw Alonzo try to wrest a "shank" out of Rocha's hand and saw Rocha "whoop" Alonzo with a cable. Davis described the "shank" that Alonzo attempted to wrest from Rocha as a "metallic" sharpened spike that was "[t]he color of plastic, like a clear pen or a piece of metal . . . silver metal." Davis was uncertain whether Alonzo was successful in taking the "shank" from Rocha's hand.

Alonzo testified that he weighed about 330 pounds at the time of his altercation with Rocha. Alonzo stated that when he came out of the shower on the night in question, Rocha approached him saying, "Orale puta," and swinging a cable.[5] After a struggle, Rocha dropped the cable after Alonzo "got a hold of [it]." Alonzo stated that at that point, he realized that Rocha "had another weapon." Alonzo testified, "He [Rocha] had a piece of spike with him that he was trying to hit me with it [sic], which he did hit me with it." Alonzo stated that, upon seeing the "spike," he was "really scared and shocked" and attempted to get the spike away from Rocha. Alonzo stated that Rocha was stabbed during the struggle.

On cross-examination, Alonzo agreed that he stabbed a "spike" into Rocha's chest and that the spike was a deadly weapon. However, Alonzo maintained that he did not intentionally stick the spike into Rocha's chest. Alonzo also testified that, at the time he stuck the spike into Rocha's chest, he was unaware of his actions because he had "blacked out" and was "fighting for [his] life." Alonzo testified that although he knew who Rocha was, and had spoken to Rocha's cellmate in the past, he had never spoken to Rocha.

_____

[5] Alonzo testified that "orale puta" is a Spanish term that means, "All right [sic], bitch. I got you now."

After the altercation, Alonzo was taken to a nurse for a physical examination. The nurse testified that at the time of the examination, she noticed abrasions on both of Alonzo's arms and bruising on his right arm. The nurse stated that Alonzo's injuries were not serious and were "superficial."

The defense also called Officer Beau Mathews, a guard at the Stiles Unit. Officer Mathews testified that Rocha was involved in a fight in the "chow hall" of Building 7 of the Stiles Unit on May 19, 2006. After the May 19 fight, Rocha was rehoused in Building 8, the building that housed Alonzo. Officer Mathews stated that upon learning that he was going to be moved to Building 8, Rocha stated that if he was moved to Building 8, he was either going to kill or be killed by "some Hispanics."

At the close of evidence, count one of the jury charge included instructions on murder, manslaughter, aggravated assault, and self-defense. Count two of the charge included instructions on the offense of possession of a deadly weapon in a penal institution. The jury found Alonzo guilty of manslaughter and possession of a deadly weapon in a penal institution. This appeal ensued.[6]

## II. JURY INSTRUCTION

In his first issue, Alonzo contends that the trial court erred by instructing the jury that the justification of self-defense does not apply to the lesser-included offense of manslaughter.

### A. Pertinent Facts

The jury charge included two counts. In count one, the jury received charges on

---

[6] This case was transferred from the Ninth Court of Appeals to the Thirteenth Court of Appeals pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (Vernon 2005).

7

murder, as well as the lesser-included offenses of manslaughter and aggravated assault. Additionally, the jury received an instruction on the justification of self-defense.[7]

During deliberations in the guilt-innocence phase of trial, the jury foreman passed a note to the trial court that read: "If we find 'not guilty' of count 1 murder by reason of self-defense[,] does that preclude us from considering the 2 lesser offenses in count 1?" The trial court responded:

> In response to your question:
>
> Self-defense does apply to Murder.
>
> Self-defense does <u>not</u> apply to Manslaughter.
>
> Self-defense does <u>not</u> apply to Aggravated Assault if the jury finds the defendant committed Aggravated Assault recklessly.

(Emphasis in original).[8] There is nothing in the record to suggest that Alonzo objected to either the jury's question or the trial court's response.[9]

## B.      Analysis

"When the trial judge responds substantively to a jury question during deliberations,

---

[7] Count two of the jury charge dealt solely with the offense of possession of a deadly weapon in a penal institution.

[8] The State contends that this answer was given in response to a note passed from the jury to the trial court that asked: "Can self-defense be applied to all 3 offenses in [c]ount 1? i.e., can 'self-defense' be used as a reason for finding 'not guilty' to the 2 lesser included offenses in count 1?"

Alonzo's issue does not concern the question asked by the jurors; instead, it concerns the substance of the trial court's answer. Accordingly, because our determination of Alonzo's appellate argument focuses on whether the substance of the trial court's answer was erroneous, we need not determine the question to which the court responded.

[9] Article 36.27 of the Texas Code of Criminal Procedure requires a trial court to notify the defendant, if possible, of a jury's questions and of the trial court's proposed answers to those questions, and provides the defendant with an opportunity to object to the trial court's answers. *See* TEX. CODE CRIM. PROC. ANN. art. 36.27 (Vernon 2006); *Word v. State*, 206 S.W.3d 646, 650 (Tex. Crim. App. 2006). When a record is silent, a presumption exists that the trial court complied with the requirements of article 36.27. *See Word*, 206 S.W.3d at 651. Alonzo does not contend that the trial court failed to follow the requirements established by article 36.27; instead, he contends that he was harmed by the substance of the trial court's response.

that communication essentially amounts to an additional or supplemental jury instruction." *Daniell v. State*, 848 S.W.2d 145, 147 (Tex. Crim. App. 1993). Because Alonzo failed to object to the trial court's response, in order to gain reversal, he must show that the trial court's response was erroneous and that such error amounted to egregious harm. *See Barrera v. State*, 982 S.W.2d 415, 416-17 (Tex. Crim. App. 1998); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g); *see also Diehl v. State*, No. 04-07-00608-CR, 2008 WL 2260833, at *3 n.2 (Tex. App.–San Antonio Jun. 4, 2008, no pet.) (mem. op., not designated for publication) (noting that a successful challenge to the substance of a trial court's response to a jury question requires that the defendant show egregious harm where the defendant did not object at trial).

Alonzo contends that the trial court's response was erroneous because "the [t]rial [c]ourt instructed the [j]ury that self-defense could not be considered as a justification to manslaughter . . . ." As his only support, Alonzo cites to an unpublished memorandum opinion from the San Antonio Court of Appeals that notes that self-defense is a justification to voluntary manslaughter. *See Frank v. State*, No. 05-92-02684-CR, 1994 WL 79341, at *2 (Tex. App.–San Antonio Mar. 11, 1994, no pet.) (mem. op., not designated for publication). We note that *Frank* was decided under the former penal code, which codified voluntary and involuntary manslaughter separately. *See* Act of May 24, 1973, 63rd Leg., R.S., ch. 399, § 1, 1973 Tex. Gen. Laws 883, 913, *amended by* Act of May 23, 1973, 63rd Leg., R.S., ch. 426, art. 2, § 1, 1973 Tex. Gen. Laws 1123, 1124, *repealed by* Act of May 24, 1993, 73rd Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3589, 3617. Under the former penal code, a person committed the offense of voluntary manslaughter if he intentionally or knowingly caused the death of an individual while under the influence of

9

sudden passion arising from an adequate cause. *See id.* Because the current version of the penal code incorporates the former voluntary manslaughter statute into the definition of murder, *see* TEX. PENAL CODE ANN. 19.02(d), Alonzo fails to cite any binding authority for his argument that self-defense is a justification to manslaughter, and we find none.[10]

The jury was instructed to find Alonzo not guilty of the offense of murder if it found that Alonzo: (1) did not intentionally or knowingly cause Rocha's death; or (2) acted in self-defense. *See* TEX. PENAL CODE ANN. § 9.31(a) (Vernon Supp. 2009), § 19.02(b)(1). In raising the justification of self-defense, the defendant bears the burden to produce some evidence that he reasonably believed use of deadly force was immediately necessary to protect himself against the victim's use or attempted use of unlawful force. *See* TEX. PENAL CODE ANN. § 9.32 (Vernon Supp. 2009); *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). "Deadly force" means force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury. *Id.* § 9.01 (Vernon 2003). Because self-defense is a justification for murder, a jury that finds that a defendant acted in self-defense must acquit the defendant. *See* TEX. PENAL CODE ANN. § 9.02 (Vernon 2003), § 9.31.

Alonzo advances his jury charge argument by asserting that the jury's notes, coupled with its "not guilty" finding on the offense of murder, conclusively prove that the jury found that he acted in self-defense. We begin by noting that "[t]he jury's decision is contained in its answers on the verdict form" and we "cannot endeavor to surmise a jury's intent from the jury's notes." *McAndrew v. State*, No. 12-03-00297-CR, 2005 WL 674195,

---

[10] We recognize that in some cases, under circumstances not present here, evidence raising a manslaughter instruction may not preclude the application of a self-defense instruction. *See e.g., Jordan v. State*, 782 S.W.2d 524, 527 (Tex. App.–Houston [14th Dist.] 1989, pet. ref'd).

at *2 (Tex. App.–Tyler Mar. 23, 2005, pet. ref'd) (mem. op., not designated for publication) (citing *Thomas v. Oldham*, 895 S.W.2d 352, 359-60 (Tex.1995)). The jury could have, as Alonzo argues, acquitted him of murder because it found that he acted in self-defense; or, it could have acquitted him simply because it did not find that he intentionally or knowingly caused Rocha's death. Even if we assume that the jury believed he acted in self-defense in acquitting him of murder, as Alonzo argues, it does not follow that the trial court's instruction that self-defense was inapplicable to the lesser-included offense of manslaughter was erroneous.

Texas courts have routinely noted that an individual cannot recklessly act in self-defense. *See, e.g., Nevarez v. State*, 270 S.W.3d 691, 695 (Tex. App.–Amarillo 2008, no pet.); *Martinez v. State*, 16 S.W.3d 845, 848 (Tex. App.–Houston [1st Dist.] 2000, pet. ref'd); *Avila v. State*, 954 S.W.2d 830, 843 (Tex. App.–El Paso 1997, pet. ref'd). A person commits murder if he "intentionally or knowingly causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(1). Because self-defense is a justification to murder, an acquittal of murder on the basis of self-defense necessarily implies that the jury believed that the defendant intentionally or knowingly caused the death of an individual. *See id.* Texas Penal Code section 19.04 provides that a person commits manslaughter "if he recklessly causes the death of an individual." *See id.* § 19.04 (Vernon 2003). Intentional or knowing conduct is distinct from reckless conduct, and an individual cannot simultaneously act intentionally and recklessly. *See id.* § 6.03. Accordingly, we conclude that the trial court's instruction precluding the application of self-defense to manslaughter was not erroneous. Alonzo's first issue is overruled.

11

## A.     Self-Defense

In his second and third issues, Alonzo contends that the evidence is legally and factually insufficient to support his manslaughter conviction because he presented evidence that he acted in self-defense. Specifically, Alonzo challenges the sufficiency of the evidence supporting the rejection of his self-defense claim.

We have already determined that the trial court did not err in instructing the jury that self-defense was inapplicable to manslaughter. Because we must assume that the jury followed the instructions given, *see Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996); *Rios v. State*, 263 S.W.3d 1, 12 (Tex. App.–Houston [1st Dist.] 2005, pet. ref'd), we cannot say that the jury considered self-defense with regard to the offense of manslaughter. Accordingly, we need not address Alonzo's argument that the jury rejected his self-defense claim. *See* TEX. R. APP. P. 47.1. Alonzo's second and third issues are overruled.

## B.     Possession of a Deadly Weapon in a Penal Institution

In his fourth and fifth issues, Alonzo contends that the evidence is legally and factually insufficient to support his conviction for the offense of possession of a deadly weapon in a penal institution. Specifically, Alonzo argues that the evidence is insufficient to prove that he possessed or concealed a deadly weapon. We disagree.

### 1. Standard of Review

In reviewing the legal sufficiency of evidence, an appellate court must review all the evidence in the light most favorable to the verdict, and ask whether "'*any* rational trier of

fact could have found the essential elements of the crime beyond a reasonable doubt'—not whether '*it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)) (emphasis in original). The trier of fact is the sole judge of the facts, the credibility of the witnesses, and the weight given to testimony. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Jackson*, 443 U.S. at 318-19; *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd). We do not reevaluate the weight and credibility of the evidence, and we do not substitute our own judgment for the trier of fact. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (en banc); *Beckham*, 29 S.W.3d at 151. We resolve any inconsistences in the evidence in favor of the judgment. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

When conducting a factual sufficiency review, an appellate court views all of the evidence in a neutral light. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We will set aside the verdict only (1) if the evidence supporting the conviction is too weak to support the verdict, or (2) when the evidence supporting the verdict is outweighed by the great weight and preponderance of the contrary evidence so as to render the verdict clearly wrong and manifestly unjust. *Laster*, 275 S.W.3d at 518 (citing *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006)); *Grotti v. State*, 273 S.W.3d 273, 283 (Tex. Crim. App. 2008). Unless the record clearly reveals that a different result is appropriate, we must defer to the fact finder's determination concerning what weight to be given to contradictory testimony. *Lancon*, 253 S.W.3d at 705.

Both legal and factual sufficiency are measured by the elements of the offense as

defined by a hypothetically correct jury charge. *Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd).

**2. Analysis**

Under a hypothetically correct jury charge, the State was required to prove beyond a reasonable doubt that Alonzo (1) while confined in a penal institution (2) intentionally or knowingly (3) possessed or concealed (4) a deadly weapon (5) therein. *See* TEX. PENAL CODE ANN. § 46.10(a). To prove possession, the State had to show that the accused exercised actual care, control, or custody of the weapon and was conscious of his or her connection with it. *See Poindexter v. State*, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005); *Brown v. State*, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995); *Nguyen v. State*, 54 S.W.3d 49, 52-53 (Tex. App.–Texarkana 2001, pet. ref'd); *see also Wilson v. State*, No. 13-04-00298-CR, 2007 WL 1559104, at *6 (Tex. App.–Corpus Christi May 31, 2007, pet. dism'd) (mem. op., not designated for publication). The evidence used to satisfy these elements can be direct or circumstantial. *See Poindexter*, 153 S.W.3d at 405-06. Whether direct or circumstantial evidence is used, the State must establish that the accused's connection with the weapon was more than just fortuitous. *See id.*

It is undisputed that Rocha died of a stab wound to the chest caused by a deadly weapon. Officer Whittley testified that he saw a "shank," which he described as "a short piece of brown metal," in Alonzo's hand during the altercation. Officer Whittley stated that Alonzo "thrust" the "shank" towards Rocha, and Rocha ran away from Alonzo holding his chest and saying that he had "been hit." Alonzo's cellmate, Woolridge, testified that soon after the altercation, Alonzo requested that he flush the "shank" down the toilet. Although

14

Woolridge testified that he refused to dispose of the "shank," the "shank" was never found. Woolridge also testified that Alonzo "often" carried a "shank" concealed "up under his belly." Woolridge stated that an injury that could be inflicted by a weapon the size and shape of the shank that he had "often" seen Alonzo carry was consistent with Rocha's fatal wound.

The jury also heard evidence that, prior to the altercation, Alonzo was released from his cell to take a shower. Alonzo left his cell wearing only a towel over his shoulders and a pair of boxer shorts. Officer Whittley did not notice a "shank" in Alonzo's possession either at the time Alonzo was released from his cell or at the time he released Alonzo from the shower. Alonzo testified that he did not carry a "shank" when he left his cell or the shower on the night of the altercation. Alonzo stated that Rocha possessed a "shank" during the altercation and that he tried to take the "shank" from Rocha's hand. Alonzo told the jury that although he grabbed Rocha's hand during the fight, he did not gain possession of Rocha's "shank."

The jury, as sole judge of the witnesses' credibility and the weight to be given their testimony, is free to accept or reject any or all of the evidence presented by either side. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04; *Jackson*, 443 U.S. at 318-19; *Beckham*, 29 S.W.3d at 151. Therefore, the jury was free to take all of the evidence into account and to believe or disbelieve any portion of Alonzo's statements. *Sorto v. State*, 173 S.W.3d 469, 475 (Tex. Crim. App. 2005).

Viewing the evidence in the light most favorable to the verdict, we conclude that the jury could have found that Alonzo intentionally or knowingly possessed a deadly weapon while confined in a penal institution. *See Jackson*, 443 U.S. at 318-39; *Watson*, 204

15

S.W.3d at 414-17; *see also Wilson*, 2007 WL 1559104, at *6 (concluding that evidence was legally and factually sufficient to support conviction for the offense of possession of a deadly weapon in a penal institution where (1) the defendant was the sole occupant of the jail cell where two shanks were found; (2) correctional officers testified that during the altercation in question, they saw a metal object in the defendant's hand; and (3) after the altercation, two shanks were found on the floor near the defendant's head). Viewing all of the evidence in a neutral light, we cannot say that the verdict was so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust; nor can we say that this finding was against the great weight and preponderance of the evidence. *See Watson*, 204 S.W.3d at 415; *see also Wilson*, 2007 WL 1559104, at *6. Accordingly, we conclude that the evidence was legally and factually sufficient to support the judgment. Alonzo's fourth and fifth issues are overruled.

## IV. JUROR MISCONDUCT

In his sixth issue, Alonzo contends that the trial court erred by denying his motion for new trial due to jury misconduct.[11]

### A. Standard of Review

We review a trial court's denial of a defendant's motion for new trial under an abuse of discretion standard. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007) (citing *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004)). We view the evidence in the light most favorable to the trial court's ruling. *Id.* We uphold the trial court ruling if the

---

[11] In his brief, Alonzo repeatedly references Texas Rule of Appellate Procedure 21.3. *See* TEX. R. APP. P. 21.3. "Rule 21.3 appears in cases addressing motions for new trial, and not in cases addressing motions for mistrial." *Ocon v. State*, 284 S.W.3d 880, 883 n.1 (Tex. Crim. App. 2009). Accordingly, we analyze Alonzo's sixth issue as a challenge to the trial court's denial of his motion for new trial, rather than a challenge to the trial court's denial of his motion for mistrial. *See id.*

ruling was not arbitrary and was within the zone of reasonable disagreement. *Id.* "A trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court ruling." *Id.* (citing *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004)).

## B.    Analysis

"The defendant must be granted a new trial . . . when, after retiring to deliberate, the jury has received other evidence." TEX. R. APP. P. 21.3(f). To show jury misconduct under this rule, the defendant must satisfy a two-prong test: (1) the evidence must have been received by the jury; and (2) the evidence must be detrimental or adverse to the defendant. *Bustamante v. State*, 106 S.W.3d 738, 743 (Tex. Crim. App. 2003).

During deliberations, the jury sent the trial court the following note:

> One juror member says he saw in this morning's paper that defendant is already serving [a] life sentence. Was this mentioned during trial[,] or does this make difference [sic]?

Upon receiving the note, the trial court brought the jury into the courtroom and sternly admonished the jurors. The trial court reminded the jurors: "[N]ews reports are not evidence. They were not admitted in this case. It is not an item of information that you are to deliberate upon in rendering a true verdict based upon your oath. Also, news reports have very questionable accuracy." The trial court then asked:

> Does any juror have a problem with excluding any news report that they may have heard about in contradiction to the instructions the Court gave you about any news report and can you render a decision completely excluding that information from deliberations, or have your deliberations been tainted by hearing that information which may or may not be accurate? . . . Mr. Hawkins, as a representative of the jury, do you believe this is something that is information that the jury can exclude from their deliberations and render a verdict true and accurate and fair based upon the law as the Court has given to you and the evidence that has been presented? What do you think,

17

sir?

The jury foreman responded that he believed that the jury could exclude the information from their deliberations. The trial court continued:

> Again, any information outside what has been presented in this courtroom under the instructions the Court has given to you is completely excluded from your deliberations. Does any juror have a problem with that? I take it from your silence you don't. . . . At this time, I'm going to instruct the jury to deliberate in light of these further instructions by this Court. You are excused to go to your deliberations.

The trial court also sent the following written response to the jury's note:

> In response to your question, you are instructed to disregard and not consider anything reported by the news regarding this case. You must follow your oaths as jurors to render a true verdict according to the law and the evidence. The jurors' oath is displayed in the deliberation room.

Alonzo immediately moved for mistrial, and the trial court denied the motion.

At the conclusion of the trial, Alonzo filed a motion for new trial. At the hearing on the motion for new trial, Alonzo called the jury foreman to testify regarding whether the juror's comments about the contents of the newspaper article impacted the jury and influenced deliberations. The jury foreman testified that about ten minutes after deliberations began, a juror stated that he had read an article that said that Alonzo had previously been convicted of murder and was serving a life sentence. The foreman testified that he immediately decided to contact the trial court by sending the aforementioned note. When asked if he remembered the instructions that the jury received in response to the note, the foreman testified:

> We were brought back into the jury box, escorted back in by the bailiff. The [j]udge scolded us and made it very clear that he had given instructions that this was not to occur, said he was disappointed that this had happened, I believe, and then later asked us if we felt we could ignore that and go on about our deliberations. And I think he made eye contact with every juror in

18

the box and everyone of us said, yes, we feel like we can render a fair verdict in the case. We were then allowed to go back into the jury room.

When asked if there was any reason to suspect that the trial court's instructions were not followed, the jury foreman testified:

> No, I don't; and I'll tell you why I feel that way. We were in the jury room, 6, 7 hours. I don't know. It was not an easy decision for us to make. And I felt like we were a very cooperative group, very collegial, and I think everybody was sincerely interested in doing justice in this case and I don't feel that knowing that had any bearing whatsoever. Again, I'm speaking for myself but I didn't—I did not pick up any hints that there was anyone in that jury room who felt that what had been said caused them to rule the way they did.

The trial court subsequently denied the motion for new trial, finding that: (1) the jurors did not thoroughly discuss the information from the article; (2) the information was "quickly" brought to the trial court's attention; and (3) the trial court "firmly" addressed the problem with the jurors. The trial court concluded that because the information "was not extensively discussed by the jury" and because thorough instructions to disregard were given," the information "was never received by the jury."

The determination of whether a juror has "received" other evidence is a question of degree. *Garza v. State*, 82 S.W.3d 791, 794 (Tex. App.–Corpus Christi 2002, no pet.). To determine whether evidence was "received," the court must look to the context in which it was mentioned and the extent to which the jurors discussed it. *Gaona v. State*, 733 S.W.2d 611, 619 (Tex. App.–Corpus Christi 1987, pet. ref'd). Moreover, "[i]n determining whether evidence was 'received' by the jury, a court may consider how extensively the evidence was examined by the jury and whether the jury was given an instruction to disregard." *Bustamante*, 106 S.W.3d at 743. An instruction to disregard at the deliberations stage of a trial is "'similar to the corrective action of an instruction to disregard

19

evidence improperly introduced at trial.'" *Id.* (quoting *Eckert v. State*, 623 S.W.2d 359, 364 (Tex. Crim. App. 1981)*, overruled on other grounds by Reed v. State*, 744 S.W.2d 112 (Tex. Crim. App. 1988)). Therefore, "[i]f the trial court gives an instruction to disregard and that instruction is found to be effective, then under our law, it is as though the evidence was never 'received' by the jury." *Id.*

At the hearing on the motion for new trial, the jury foreman testified that he "immediately" informed the trial court that a juror had shared information that he learned from a newspaper article with the rest of the jury. The trial court called the jury into the courtroom and instructed it that any evidence outside that presented in the courtroom was not evidence. Alonzo presented no evidence that the jury failed to follow the trial court's instruction to disregard or that the jury was unable to exclude the information from the newspaper article from their deliberations. Under the circumstances presented here, we conclude that the information from the newspaper article was not "received" by the jury. *See id.* at 744. Accordingly, the trial court did not abuse its discretion by denying Alonzo's motion for new trial. *See Webb*, 232 S.W.3d at 112. Alonzo's sixth issue is overruled.

## V. Conclusion

Having overruled all of Alonzo's issues on appeal, we sustain the trial court's judgment as to manslaughter. We affirm as modified the trial court's judgment regarding the offense of possession of a deadly weapon in a penal institution.

_____
ROGELIO VALDEZ
Chief Justice

Publish.
Tex. R. App. P. 47.2(b)
Delivered and filed the
29th day of July, 2010.

20