

# NUMBER 13-09-00395-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**JOSE ALONZO,**                                                            **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                      **Appellee.**

---

## On appeal from the Criminal District Court
## of Jefferson County, Texas.

---

## MEMORANDUM OPINION ON REMAND

### Before Chief Justice Valdez and Justices Rodriguez and Garza
### Memorandum Opinion on Remand by Chief Justice Valdez

A jury convicted appellant, Jose Alonzo, of manslaughter. On original submission, we affirmed the conviction, concluding that self-defense does not apply to the offense of manslaughter. *Alonzo v. State*, 328 S.W.3d 19, 27 (Tex. App.—Corpus Christi 2010, pet. granted), *rev'd* 353 S.W.3d 778, 783 (Tex. Crim. App. 2011). The court of criminal appeals disagreed and remanded the case to us for a harm analysis. *Alonzo*, 353 S.W.3d at 782. We reverse and remand.

## I.    BACKGROUND

After the jury began its deliberations, it sent a note to the trial court asking whether self-defense applied to the offense of manslaughter.  The trial court responded that self-defense only applied to the offense of murder.  This Court agreed with the trial court and held that when a person's acts are reckless, he is not entitled to an instruction on self-defense.  *Alonzo*, 328 S.W.3d at 27.  The court of criminal appeals disagreed and found the trial court's instruction erroneous.  *Alonzo*, 353 S.W.3d at 782.  We will now determine whether Alonzo suffered harm from the trial court's erroneous instruction.

## II.    THE EVIDENCE

In our original opinion, we described the evidence as follows:

> On June 30, 2006, an altercation arose between Alonzo and Victor Rocha, two "close custody" inmates imprisoned in Building 8, K-pod, Section 2 of the Texas Department of Criminal Justice Institutional Division's Stiles Unit located in Jefferson County, Texas.  During the incident, Rocha sustained injuries and died of a stab wound to the chest.

> . . . .

> Officer Roger Whittley, the only correctional officer on duty in Section 2 at the time of the incident, testified that he released Alonzo from his cell and led him to a nearby inmate shower stall sometime around 10:00 p.m. on the night of the altercation.  Officer Whittley did not perform a pat-down or a full-body search of Alonzo before releasing him from his cell, which was located on the second floor of Section 2.  Without being handcuffed, Alonzo was led to and locked in an individual shower stall located on the second floor near his cell.

> Officer Whittley stated that Rocha, who had been released from his cell to move to another cell, "roamed" around the three floors of Section 2 while Alonzo showered.  Shortly before Alonzo was released from the shower, Rocha was seen standing in the stairwell of the second floor. After a short time, Officer Whittley released Alonzo from the shower stall. Alonzo emerged from the shower stall wearing only a pair of boxers and a towel around his neck; a full body search was not performed.  Rocha moved from the stairwell and met Alonzo shortly before Alonzo reached his cell.   Officer Whittley heard Alonzo and Rocha shouting in Spanish.

2

Officer Whittley then saw the two men "collide" and "wrestle each other." On cross-examination, after viewing a surveillance video, Officer Whittley stated that Rocha appeared to have extended his arm and initiated the contact with Alonzo. As Alonzo and Rocha fought, Officer Whittley saw a "shank" made of a piece of brown metal in Alonzo's hand. Officer Whittley did not see a "shank" in Rocha's hand; however, he testified that at the beginning of the fight, Rocha possessed "some type of cord."

Officer Whittley testified that the fight ended when Alonzo thrust the brown metallic "shank" towards Rocha. Alonzo and Rocha separated, and Rocha ran past Officer Whittley holding his chest and saying that he had "been hit." Rocha then fell to the ground bleeding. Meanwhile, Alonzo returned to his cell and "demanded" that he be allowed to enter it. Officer Whittley stated that Alonzo then passed the "shank" through a cell door. Soon after, Alonzo was handcuffed and led away from the cell area. While being led away, Alonzo shouted "obscenities" in English and Spanish to Rocha. Officer Christopher Moore recalled that Alonzo yelled something to Rocha "[a]long the lines of, I hope you die, motherfucker. You get what you deserve . . . ." No brown metallic object or any type of "shank" was recovered after the altercation.

Forensic pathologist Dr. Tommy Brown, testified that he performed an autopsy examination on Rocha. Dr. Brown stated that a stab wound inflicted by a deadly weapon caused Rocha's death. On cross-examination, Dr. Brown testified that he found no defensive wounds on Rocha's body.

Alonzo's cellmate, James Woolridge, testified that he heard a conversation between Alonzo and Rocha approximately a week and a half before the altercation. Woolridge stated that during the conversation, Alonzo told Rocha that Rocha was "disrespecting [Alonzo] and his gang" and "needed to pack [Rocha's] property and move off the wing and show [Alonzo] some respect." According to Woolridge, Alonzo indicated that he would kill Rocha if Rocha did not move to a different prison wing.

When questioned about Alonzo's gang affiliation, Woolridge testified that Alonzo told him that he was in a "Mexico gang." Woolridge also stated that Alonzo "often" carried a "shank." When asked how Alonzo would carry the "shank," Woolridge replied, "He would lift up his big-old fat belly, stick the weapon up under his belly and let his belly go and his belly would hold the weapon down."

Woolridge stated that on the night in question, he was inside the cell that he shared with Alonzo. Woolridge did not witness the altercation; however, he stated that after the fight ended, Alonzo came to the cell door and attempted to pass him a "knife." Woolridge testified that Alonzo requested that he "tear it up, destroy it, and flush it down the toilet." Woolridge testified that he refused to comply with Alonzo's request.

3

Woolridge stated that the "shank" that he had "often" seen Alonzo carry could have caused Rocha's fatal wound.

Rocha's cellmate, Michael Martinez, also testified. Martinez testified that he and Rocha were members of the "Mexican Mafia" gang. Martinez stated that Alonzo was a member of a gang known as the "Partidos Revolucionarios de Mexicles" ("PRM"). According to Martinez, Rocha was involved in an altercation with a PRM member a "couple of days" before Rocha's fight with Alonzo. Martinez claimed that Alonzo and Alonzo's friend and fellow PRM member, Armando Alvarado, indicated that they planned to kill Rocha. Martinez testified that after learning this information, he feared for Rocha and gave Rocha a "shank" made of a sharpened eight-to-ten-inch piece of chainlink fence. After viewing a photograph of Rocha's fatal stab wound, Martinez stated that the size and shape of the "shank" that he gave to Rocha was not consistent with the wound.

. . . .

Ricky Davis, an inmate housed in the same building as Alonzo on the night in question, testified that he witnessed the altercation between Alonzo and Rocha after being awakened by the commotion outside of his cell. Davis stated that he did not see the beginning or the end of the fight. However, after he woke up, Davis looked out of his cell's window and saw Alonzo and Rocha "fighting" and "wrestling." Davis saw Alonzo try to wrest a "shank" out of Rocha's hand and saw Rocha "whoop" Alonzo with a cable. Davis described the "shank" that Alonzo attempted to wrest from Rocha as a "metallic" sharpened spike that was "[t]he color of plastic, like a clear pen or a piece of metal . . . silver metal." Davis was uncertain whether Alonzo was successful in taking the "shank" from Rocha's hand.

Alonzo testified that he weighed about 330 pounds at the time of his altercation with Rocha. Alonzo stated that when he came out of the shower on the night in question, Rocha approached him saying, "Orale puta," and swinging a cable. After a struggle, Rocha dropped the cable after Alonzo "got a hold of [it]." Alonzo stated that at that point, he realized that Rocha "had another weapon." Alonzo testified, "He [Rocha] had a piece of spike with him that he was trying to hit me with it [sic], which he did hit me with it." Alonzo stated that, upon seeing the "spike," he was "really scared and shocked" and attempted to get the spike away from Rocha. Alonzo stated that Rocha was stabbed during the struggle.

On cross-examination, Alonzo agreed that he stabbed a "spike" into Rocha's chest and that the spike was a deadly weapon. However, Alonzo maintained that he did not intentionally stick the spike into Rocha's chest. Alonzo also testified that, at the time he stuck the spike into Rocha's chest, he was unaware of his actions because he had "blacked out" and was "fighting for [his] life." Alonzo testified that although he knew who

4

Rocha was, and had spoken to Rocha's cellmate in the past, he had never spoken to Rocha.

After the altercation, Alonzo was taken to a nurse for a physical examination. The nurse testified that at the time of the examination, she noticed abrasions on both of Alonzo's arms and bruising on his right arm. The nurse stated that Alonzo's injuries were not serious and were "superficial."

The defense also called Officer Beau Mathews, a guard at the Stiles Unit. Officer Mathews testified that Rocha was involved in a fight in the "chow hall" of Building 7 of the Stiles Unit on May 19, 2006. After the May 19 fight, Rocha was rehoused in Building 8, the building that housed Alonzo. Officer Mathews stated that upon learning that he was going to be moved to Building 8, Rocha stated that if he was moved to Building 8, he was either going to kill or be killed by "some Hispanics."

At the close of evidence, count one of the jury charge included instructions on murder, manslaughter, aggravated assault, and self-defense. Count two of the charge included instructions on the offense of possession of a deadly weapon in a penal institution. The jury found Alonzo guilty of manslaughter and possession of a deadly weapon in a penal institution.

*Id.* at 22–25.

### III.    APPLICABLE LAW

A person acts intentionally if it is his "conscious objective or desire" to engage in the prohibited conduct or cause the prohibited result. TEX. PENAL CODE ANN. § 6.03(a) (West 2011). A person acts knowingly if he acts with awareness of the nature of his conduct or that the conduct is "reasonably certain to cause the prohibited result." *Id.* § 6.03(b). "A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 6.03(c). "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's

5

standpoint." *Id.* However, "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a).

## IV. STANDARD OF REVIEW

"When the trial judge responds substantively to a jury question during deliberations, that communication essentially amounts to an additional or supplemental jury instruction." *Daniell v. State*, 848 S.W.2d 145, 147 (Tex. Crim. App. 1993). Accordingly, because Alonzo did not object to the trial court's instruction, we must determine whether he suffered egregious harm. *See id.*; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984); *see also Alonzo*, 353 S.W.3d at 783.

In determining whether egregious harm exists, we examine the charge in its entirety, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole. *Almanza*, 686 S.W.2d at 171. Under the *Almanza* egregious-harm standard, the record must show that a defendant has suffered actual, rather than merely theoretical, harm from the jury-instruction error. *Id.* at 174. Egregious harm consists of errors affecting the very basis of the case or that deprive the defendant of a valuable right, vitally affect a defensive theory, or make the case for conviction or punishment clearly and significantly more persuasive. *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991). Egregious harm is a difficult standard to prove and must be determined on a case-by-case basis. *Ellison v. State*, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002).

V.    DISCUSSION

The jury's charge stated that self-defense only applied to "COUNT I." Count one included the charge of murder and the lesser included offenses of manslaughter and aggravated assault. *See* TEX. PENAL CODE ANN. §§ 19.02(b), 19.04(a) (West 2011). Accordingly, the jury charge correctly instructed the jury that self-defense applied to manslaughter.

During the State's closing argument, the prosecutor stated that Alonzo could be convicted of two counts by the jury. The prosecutor informed the jury that self-defense applied to count one, which included murder, manslaughter, and aggravated assault. The prosecutor said, "So, if you believe that this was self defense, then that would acquit him of Count 1." Therefore, the prosecutor correctly instructed the jury that self-defense applied to manslaughter.

Defense counsel stated that Alonzo testified that he was in "fear of [his] life" and "did what was necessary to get this man off of [him]." Defense counsel emphasized that this case is clearly about self-defense.

When the jury foreperson sent the trial court the note asking if self-defense applied to manslaughter, the trial court replied that it only applied to murder. And, as explained below, it is not clear from the evidence whether the jury found that Alonzo acted in self-defense or whether it found that he did not act intentionally or knowingly when it acquitted him of murder. *See id.* § 19.02(b) (requiring that to commit the offense of murder, a person must act either intentionally or knowingly).

The evidence showed that Alonzo's gang was threatening to kill Rocha and that Alonzo himself had threatened to kill Rocha. Alonzo and members of his gang had planned to kill Rocha. Rocha was in fear for his life and wanted to move out of the cell

7

block. Rocha predicted that someone in a Mexican gang would kill him. Alonzo was known to carry a shank. There was also evidence presented that Rocha only had a cord.

However, the evidence also showed that Rocha "met" Alonzo shortly before Alonzo reached his cell and that Rocha initiated the physical altercation with Alonzo. Evidence was presented that Rocha had previously been involved in an altercation with members of Alonzo's gang. A witness to the altercation saw Alonzo attempt to wrest a shank out of Rocha's hand and saw Rocha "whoop" Alonzo with a cable. Alonzo testified that Rocha swung a cable at him and then attempted to stab Alonzo with a spike. Alonzo was "really scared and shocked." Rocha was stabbed during the struggle. Alonzo claimed that he was fighting for his life.

The jury acquitted Alonzo of murder and convicted him of manslaughter. Therefore, the jury may have reached this decision by finding that Alonzo either acted in self-defense or by finding that he did not commit the offense intentionally or knowingly. If the jury found that Alonzo acted in self-defense, it was required to acquit him of both murder and manslaughter. *See Alonzo*, 353 S.W.3d at 781 ("If a fact-finder believes that a defendant's actions are justified under Chapter 9 (or has a reasonable doubt that the actions were justified under Chapter 9), the plain meaning of Sections 9.02 and 2.03 is that the fact-finder may not convict the defendant for an offense based on those actions."). However, the trial court instructed the jury that it could not consider self-defense for the manslaughter charge, and for this reason, we are unable to determine the jury's reason for acquitting Alonzo of murder.

In our review, we may consider other relevant factors, and we believe that the note sent by the jury asking whether self defense applied to manslaughter weighs

8

heavily in favor of finding that there was egregious harm in this case because the jury may have acquitted him of murder on the basis that he acted in self-defense. Here, the trial court's error affected the very basis of the case and vitally affected Alonzo's defensive theory that he acted in self-defense because there was significant evidence presented that Alonzo may have acted in self-defense—a factual finding for the jury to decide—and the jury was precluded from making this determination due to error. Thus, we find that Alonzo suffered actual harm from the error. *See Saunders*, 817 S.W.2d at 692. Accordingly, we conclude that, based on the charge in its entirety, the state of the evidence, the argument of counsel, and the other relevant information in the record, Alonzo was egregiously harmed by the trial court's error. *See Almanza*, 686 S.W.2d at 171. We sustain Alonzo's issue claiming that he suffered egregious harm due to the trial court's erroneous instruction.

## VI. CONCLUSION

We reverse the trial court's judgment of conviction for manslaughter and remand for a new trial consistent with this opinion.

_____
ROGELIO VALDEZ
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
4th day of October, 2012.

9