**Opinion issued August 5, 2021**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-19-00874-CV

_____

**CHCA CLEAR LAKE, L.P. D/B/A CLEAR LAKE REGIONAL MEDICAL CENTER, WILLIAM UZELMEIER, M.D., MICHAEL NORMAN, M.D., DARRELL L. MOULTON, JR., M.D., SAFI MADAIN, M.D., AND CHERYL BREAUX, FNP, Appellants**

**V.**

**JON K. STEWART, Appellee**

---

**On Appeal from the 152nd District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-76280**

---

**MEMORANDUM OPINION**

In this interlocutory appeal,[1] appellants, CHCA Clear Lake, L.P., doing business as Clear Lake Regional Medical Center ("Clear Lake Regional"), William Uzelmeier, M.D., Michael Norman, M.D., Darrell L. Moulton, Jr., M.D., Safi Madain, M.D., and Cheryl Breaux, FNP (collectively, "appellants"), challenge the trial court's orders overruling their objections and denying their motions to dismiss the health care liability claims[2] brought against them by appellee, Jon K. Stewart, in his suit for negligence. In multiple issues, appellants contend that the trial court erred in overruling their objections and denying their motions to dismiss Stewart's claims against them.[3]

We reverse and remand.

## Background

In his first amended petition, Stewart alleges that on October 22, 2016, he was involved in a "bicycle incident." He was admitted to Clear Lake Regional as a trauma patient. Drs. Uzelmeier, Norman, Moulton, and Madain and nurse practitioner Breaux provided Stewart with medical care. While at Clear Lake Regional, it was "noted" that Stewart had "a compromised spine with extensive

---

[1]  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9).

[2]  *See id.* § 74.001(a)(13) (defining "[h]ealth care liability claim" (internal quotations omitted)).

[3]  *See id.* § 74.351 (governing expert reports).

2

cervical disc disease[4] that made him susceptible to be[ing] easily injured." Yet none of the physicians nor nurse practitioner Breaux "took [any] affirmative action to inform . . . Stewart [that] he should take precautions to guard his neck or [that he should] seek additional medical treatment" related to his cervical disc disease. After Stewart was discharged from Clear Lake Regional, he had surgery to repair his injuries from the bicycle incident. Another physician from another hospital performed that surgery. Stewart alleges that sometime later, after his surgery, he was rendered a quadriplegic.

Stewart brings health care liability claims against appellants, alleging that they failed to exercise the requisite degree of skill and care ordinarily exercised by any careful, prudent physician, resident, intern, representative, employee, or agent in the same or similar circumstances. According to Stewart, appellants were negligent in failing to inform him of "a dangerous medical condition" and failing to adequately document that condition. Appellants' negligence "proximately caused [Stewart's] resulting injuries and damages." Stewart also alleges that Clear Lake Regional is vicariously liable for the negligent acts and omissions of its "agents, servants, and/or employees."

---

4   *See Rumzek v. Lucchesi*, 543 S.W.3d 327, 334 n.5 (Tex. App.—El Paso 2017, pet. denied) ("Cervical degenerative disc disease develops when one or more of the cushioning discs in the cervical spine starts to break down due to 'wear and tear' over the course of the patient's lifetime.").

Stewart requests damages for the reasonable costs of necessary medical treatment in the past, the reasonable costs for any necessary medical treatment in the future, the physical pain and mental anguish Stewart suffered in the past and will suffer in the future, the physical impairment and disfigurement Stewart suffered in the past and will suffer in the future, and the loss of earning capacity Stewart suffered in the past and will suffer in the future. Stewart also seeks punitive damages.

To support his claims, Stewart timely served appellants with two medical expert reports. The first expert report was authored by Thomas M. DeBerardino, M.D.[5] The second report was authored by Julie Lindenberg, DNP.[6] Appellants objected to the expert reports on multiple grounds and moved to dismiss Stewart's claims against them. In response to appellants' objections and motions to dismiss, Stewart sought an extension under Texas Civil Practice and Remedies Code section 74.351(c) to cure any deficiencies in his expert reports.[7] After a hearing, the trial court granted Stewart's motion for extension, allowing him thirty days "to cure any deficiencies in his expert reports."

---

[5]     Dr. DeBerardino attached his curriculum vitae ("CV") to his expert report.

[6]     Lindenberg attached her CV to her expert report.

[7]     *See id.* § 74.351(c).

4

Stewart then served on appellants an amended expert report authored by Dr. DeBerardino.[8]  In his amended expert report, Dr. DeBerardino states that he is a licensed physician and is board certified in orthopedic surgery.  He also holds a certificate of additional qualification in sports medicine.  He primarily practices in the areas of orthopedic surgery and sports medicine.  He is a practicing orthopedic surgeon.  Additionally, Dr. DeBerardino notes that he is the clinical professor of orthopedic surgery at Baylor College of Medicine at the San Antonio Orthopedic Group, the co-director of the Baylor College of Medicine – San Antonio Combined Texas Sports Medicine Fellowship, the Gold Cup International Soccer sports medicine consultant, the medical director for the Burkhart Research Institute of Orthopedics of the San Antonio Orthopedic Group, a practicing orthopedic surgeon at the San Antonio Orthopedic Group, and a member of the Physician Leadership Counsel for the Baptist North Central Hospital in San Antonio, Texas.

His medical experience includes a military medical background and assignments including an orthopedic residency at the Tripler Army Medical Center, a joint and soft tissue trauma fellowship at the U.S. Army Institute of Surgical Research, a joint and soft tissue trauma fellowship at the West Point MEDDAC, a member of the orthopedic staff on the orthopedic surgery service at the Brooke Army

---

[8] Dr. DeBerardino attached his CV to his amended expert report.  The amended expert report superseded Dr. DeBerardino's initial expert report.  *See Cornejo v. Hilgers*, 446 S.W.3d 113, 124 n.11 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).

Medical Center, the chief of the sports medicine section of the orthopedic surgery service at the Brooke Army Medical Center, the chief of the orthopedic surgery service at the 801st Combat Support Hospital in support of Operation Iraqi Freedom, and the chief of the orthopedic surgery service at Keller Army Hospital.

Dr. DeBerardino also explains that as a military physician he was trained in and practiced in trauma and emergency care. And he has directed hospital staff regularly. Dr. DeBerardino states that he often treats patients, like Stewart, who have extensive mid to low cervical degenerative disc disease. He is familiar with the standard of care for sports and traumatic cervical spine injuries.

In his report, Dr. DeBerardino states that on October 22, 2016, Stewart was involved in a "bicycle incident" and was admitted to Clear Lake Regional as a trauma patient. Drs. Uzelmeier, Norman, Moulton, and Madain and nurse practitioner Breaux provided Stewart with medical care. While at Clear Lake Regional, it was "noted" that Stewart had "a compromised spine with extensive cervical disc disease that made him susceptible to be[ing] easily injured." Yet none of the physicians nor nurse practitioner Breaux "took [any] affirmative action to inform . . . Stewart [that] he should take precautions to guard his neck or [that he should] seek additional medical treatment." After being discharged from Clear Lake Regional, another physician from another hospital performed surgery to repair Stewart's bicycle-incident injuries. Later, Stewart broke his neck and injured his

spinal cord in the same location of an "undisclosed stenosis."[9]   He is now a quadriplegic.

As to the standard of care and breach of the standard of care for Dr. Uzelmeier, a radiologist, Dr. DeBerardino states that on October 22, 2016, Dr. Uzelmeier made a radiology report to Dr. Madain about Stewart that said:  "Posterior osteophytes at C5-6 and C6-7 result in mild acquire[d] spinal stenosis" and "[m]id to lower cervical degenerative disc disease with reversal of cervical curvature."  (Internal quotations omitted.)  According to Dr. DeBerardino, when a radiologist's findings show that a patient has extensive mid to lower cervical degenerative disc disease, the radiologist must inform the patient of the condition and its risks, so that the patient can take the necessary steps to avoid any known risks and complications such as spinal fractures.[10]  Dr. Uzelmeier breached the standard of care by:  (1) failing to inform Stewart that he had extensive mid and lower cervical degenerative disc disease and

---

[9]   *See Pacheco-Serrant v. Munoz*, 555 S.W.3d 782, 786 n.4 (Tex. App.—El Paso 2018, no pet.) ("According to medical literature, stenosis means the abnormal narrowing of a body channel.  When combined with the word spinal, it defines a narrowing of the bone channel occupied by the spinal nerves or the spinal cord." (internal quotations omitted)).

[10]   Dr. DeBerardino states that, as an orthopedic surgeon, he is qualified to opine on the standard of care for a radiologist because orthopedic surgeons work closely with radiologists and the specialties are intertwined.  Both specialties review and interpret imaging tools such as x-rays, computed tomography ("CT") scans, and magnetic resonance imaging ("MRI") results and are responsible for correctly and accurately informing patients of their diagnoses and risk factors.

(2) failing to be a patient advocate and inform Stewart of the serious consequences of that condition.

As to causation for Dr. Uzelmeier, Dr. DeBerardino states that Dr. Uzelmeier had a discussion with Dr. Madain and Dr. Norman about the care that Stewart was receiving. But Dr. Uzelmeier did not inform Stewart of the extensive mid to lower cervical degenerative disc disease and the possibility of serious injury or death as a consequence of the condition. Because Dr. Uzelmeier violated the standard of care for a radiologist, Stewart suffered a spinal cord injury in the same location as an "undisclosed stenosis." If Dr. Uzelmeier had followed the standard of care, within a reasonable medical probability, Stewart's neurologic condition would have remained stable and would not have progressed. He would have had the option of receiving neurosurgical consultation and care, which could have included further neurological testing, like electromyography ("EMG"), detailed cervical spine care and activity limitations, physical therapy/rehabilitation, and/or surgical intervention. Stewart would have had surgery to correct his condition, or he would have been prohibited from engaging in the activities that led to his broken neck. Instead, profound neurologic compromise occurred. Because Stewart was not informed of his fragile condition and the need to take immediate protective measures until his condition could be corrected, he continued to engage in his normal athletic activities, risking and injuring his spinal cord, which led to a neurological injury. Had Stewart

8

been properly advised of his condition, based on his medical records showing patient compliance with physician instruction, it is likely that he would have obeyed a physician's instructions to restrict his activity until further evaluation and treatment of his condition could be undertaken and he would not have suffered a broken neck and a neurological deficit.

As to the standard of care and breach of the standard of care for Dr. Madain, Dr. DeBerardino states that on October 22, 2016, Dr. Madain, an emergency room physician, received a radiology report from Dr. Uzelmeier about Stewart. The radiology report said: "Posterior osteophytes at C5-6 and C6-7 result in mild acquire[d] spinal stenosis" and "[m]id to lower cervical degenerative disc disease with reversal of cervical curvature." (Internal quotations omitted.) According to Dr. DeBerardino, when a patient's records show a finding of extensive mid to lower cervical degenerative disc disease, an emergency room physician must inform the patient of this condition and its risks, so that the patient can take the necessary steps to avoid any known risks and complications, such as spinal fractures.[11] Dr. Madain breached the standard of care by: (1) failing to inform Stewart that he had extensive

---

[11] Dr. DeBerardino states that, as an orthopedic surgeon, he is qualified to opine on the standard of care for an emergency room physician because orthopedic surgeons work closely with emergency medicine physicians and the specialties are intertwined. Also, as a military physician, Dr. DeBerardino was trained in and practiced in trauma and emergency care.

9

mid and lower cervical degenerative disc disease and (2) failing to be a patient advocate and inform Stewart of the serious consequences of that condition.

As to the standard of care and breach of the standard of care for Dr. Norman, a trauma physician, Dr. DeBerardino states that when a patient's records show a finding of extensive mid to lower cervical degenerative disc disease, a trauma physician must inform the patient of this condition and its risks, so that the patient can take the necessary steps to avoid any known risks and complications, such as spinal fractures.[12]  Dr. Norman breached the standard of care by:  (1) failing to inform Stewart that he had extensive mid and lower cervical degenerative disc disease and (2) failing to be a patient advocate and inform Stewart of the serious consequences of that condition.

As to causation for Drs. Madain and Norman, Dr. DeBerardino states that the physicians did not inform Stewart of the extensive mid to lower cervical degenerative disc disease and the possibility of serious injury or death as a consequence of the condition.  Because Drs. Madain and Norman violated the applicable standards of care for an emergency room physician and a trauma physician, respectively, Stewart suffered a spinal cord injury in the same location as

---

[12]  Dr. DeBerardino states that, as an orthopedic surgeon, he is qualified to opine on the standard of care for a trauma physician because orthopedic surgeons work closely with trauma physicians and the specialties are intertwined.  Also, as a military physician, Dr. DeBerardino was trained in and practiced in trauma and emergency care.

an "undisclosed stenosis." If Drs. Madain and Norman had followed the standards of care, within a reasonable medical probability, Stewart's neurologic condition would have remained stable and would not have progressed. He would have had the option of receiving neurosurgical consultation and care, which could have included further neurological testing, like EMG, detailed cervical spine care and activity limitations, physical therapy/rehabilitation, and/or surgical intervention. Stewart would have had surgery to correct his condition, or he would have been prohibited from engaging in the activities that led to his broken neck. Instead, profound neurologic compromise occurred. Because Stewart was not informed of his fragile condition and the need to take immediate protective measures until his condition could be corrected, he continued to engage in his normal athletic activities, risking and injuring his spinal cord, which led to a neurological injury. Had Stewart been properly advised of his condition, based on his medical records showing patient compliance with physician instruction, it is likely that he would have obeyed a physician's instructions to restrict his activity until further evaluation and treatment of his condition could be undertaken, and he would not have suffered a broken neck and a neurological deficit.

As to the standard of care and breach of the standard of care for Dr. Moulton, an orthopedic surgeon, Dr. DeBerardino states that when a patient's records show a finding of extensive mid to lower cervical degenerative disc disease, an orthopedic

11

surgeon must inform the patient of this condition and its risks, so that the patient can take the necessary steps to avoid any known risks and complications, such as spinal fractures.[13] Dr. Moulton breached the standard of care by: (1) failing to inform Stewart that he had extensive mid and lower cervical degenerative disc disease and (2) failing to be a patient advocate and inform Stewart of the serious consequences of that condition.

As to causation for Dr. Moulton, Dr. DeBerardino states that Dr. Moulton did not inform Stewart of the extensive mid to lower cervical degenerative disc disease and the possibility of serious injury or death as a consequence of the condition. Because Dr. Moulton violated the standard of care for an orthopedic surgeon, Stewart suffered a spinal cord injury in the same location as an "undisclosed stenosis." If Dr. Moulton had followed the applicable standard of care, within a reasonable medical probability, Stewart's neurologic condition would have remained stable and would not have progressed. He would have had the option of receiving neurosurgical consultation and care, which could have included further neurological testing, like EMG, detailed cervical spine care and activity limitations, physical therapy/rehabilitation, and/or surgical intervention. Stewart would have had surgery to correct his condition, or he would have been prohibited from engaging

---

[13]    Dr. DeBerardino states that, as a practicing orthopedic surgeon, he is qualified to opine on the standard of care for an orthopedic surgeon because he is board certified in orthopedic surgery.

12

in the activities that led to his broken neck. Instead, profound neurologic compromise occurred. Because Stewart was not informed of his fragile condition and the need to take immediate protective measures until his condition could be corrected, he continued to engage in his normal athletic activities, risking and injuring his spinal cord, which led to a neurological injury. Had Stewart been properly advised of his condition, based on his medical records showing patient compliance with physician instruction, it is likely that he would have obeyed a physician's instructions to restrict his activity until further evaluation and treatment of his condition could be undertaken, and he would not have suffered a broken neck and a neurological deficit.

As to the standard of care and breach of the standard of care for Clear Lake Regional, Dr. DeBerardino states that when a patient's records show a finding of extensive mid to lower cervical degenerative disc disease, a hospital's representatives, either its nurses or physicians, must inform the patient of the condition and its risks, so that the patient can take the necessary steps to avoid any known risks and complications, such as spinal fractures.[14] Clear Lake Regional breached the standard of care by: (1) failing to have hospital employees and

---

[14] Dr. DeBerardino states that, as an orthopedic surgeon, he is qualified to opine on the standard of care for a hospital because he was the chief of the sports medicine section of the orthopedic surgery service at Brooke Army Medical Center, the chief of orthopedic surgery at the 801st Combat Support Hospital, and the chief of the orthopedic surgery service at Keller Army Hospital.

representatives, either its nurses or physicians, inform Stewart that he had extensive mid and lower cervical degenerative disc disease and (2) failing to have hospital employees or representatives be patient advocates and inform Stewart of the serious consequences of that condition.

As to causation for Clear Lake Regional, Dr. DeBerardino states that because Clear Lake Regional violated the applicable standard of care, Stewart suffered a spinal cord injury in the same location as an "undisclosed stenosis." If Clear Lake had followed the standard of care, within a reasonable medical probability, Stewart's neurologic condition would have remained stable and would not have progressed. He would have had the option of receiving neurosurgical consultation and care, which could have included further neurological testing, like EMG, detailed cervical spine care and activity limitations, physical therapy/rehabilitation, and/or surgical intervention. Stewart would have had surgery to correct his condition, or he would have been prohibited from engaging in the activities that led to his broken neck. Instead, profound neurologic compromise occurred. Because Stewart was not informed of his fragile condition and the need to take immediate protective measures until his condition could be corrected, he continued to engage in his normal athletic activities, risking and injuring his spinal cord, which led to a neurological injury. Had Stewart been properly advised of his condition, based on his medical records showing patient compliance with physician instruction, it is likely that he would

14

have obeyed a physician's instructions to restrict his activity until further evaluation and treatment of his condition could be undertaken, and he would not have suffered a broken neck and a neurological deficit.

As to the standard of care and breach of the standard of care for nurse practitioner Breaux, Dr. DeBerardino states that a nurse practitioner must make accurate and complete documentation of the assessment of the radiologically present cervical spine condition upon discharge, must notify a patient of the radiologically present cervical spine condition, including the potential course of the disease, sequelae, and neurological warning signs and symptoms, and must provide comprehensive patient discharge education on follow up cervical spine care, precautions, activity limitations, and follow up treatment.[15]  Nurse practitioner Breaux breached the standard of care by:  (1) failing to document Stewart's extensive cervical disc disease and compromised spine upon discharge, (2) neglecting to notify Stewart of that dangerous medical condition and potential neurologic sequelae at the time of discharge, and (3) failing to educate Stewart on the care and follow up for his unstable cervical spine at the time of discharge.

---

[15]    Dr. DeBerardino states that, as an orthopedic surgeon, he is qualified to opine on the standard of care for a nurse practitioner because he was the chief of the sports medicine section of the orthopedic surgery service at Brooke Army Medical Center, the chief of orthopedic surgery at the 801st Combat Support Hospital, and the chief of the orthopedic surgery service at Keller Army Hospital, and, as such, he directed hospital staff regularly.

As to causation for nurse practitioner Breaux, Dr. DeBerardino states that because nurse practitioner Breaux violated the applicable standard of care, Stewart suffered a spinal cord injury in the same location as an "undisclosed stenosis." If nurse practitioner Breaux had followed this standard of care, within a reasonable medical probability, Stewart's neurologic condition would have remained stable and would not have progressed. Stewart would have had the option of receiving neurosurgical consultation and care, which could have included further neurological testing, like EMG, detailed cervical spine care and activity limitations, physical therapy/rehabilitation, and/or surgical intervention. He would have had surgery to correct his condition, or he would have been prohibited from engaging in the activities that led to his broken neck. Instead, profound neurologic compromise occurred. Because Stewart was not informed of his fragile condition and the need to take immediate protective measures until his condition could be corrected, he continued to engage in his normal athletic activities, risking and injuring his spinal cord, which led to a neurological injury. Had Stewart been properly advised of his condition, based on his medical records showing patient compliance with physician instruction, it is likely that he would have obeyed a physician's instructions to restrict his activity until further evaluation and treatment of his condition could be undertaken, and he would not have suffered a broken neck and a neurological deficit. The failure to notify Stewart of his extensive mid to lower cervical spine disc disease

16

as it related to his discharge care and follow up was, in Dr. DeBerardino's opinion, a causative factor in Stewart's "suffering a subsequent life[-]altering neurologic[al] injury."

Finally, Dr. DeBerardino concludes that Stewart's injuries were foreseeable and could have been reasonably anticipated as a result of appellants' breaches of the applicable standards of care. Appellants' breaches of the relevant standards of care were substantial factors in bringing about Stewart's harm, and without such conduct, Stewart's injuries would not have occurred.

Stewart never served appellants with an amended expert report authored by Lindenberg. In her original expert report, Lindenberg states that she has a Clinical Doctor of Nursing Practice and she is a board-certified family nurse practitioner. She is also a certified professional in health care quality by the National Association of Health Care Quality, a diplomate of the American Board of Comprehensive Care ("ABCC"), a member of the board of directors for ABCC, the director of performance improvement at Parkland Health and Hospital System, and a consultant reviewer for several nursing and nurse practitioner journals.

As to her medical experience, Lindenberg states that she often treats patients, like Stewart, who present with various types of cervical spine abnormalities, which are evident radiologically, both as a chief complaint or as incidental radiologic findings. She is familiar with the standard of care for a family nurse practitioner

17

who is treating a patient with Stewart's condition. Lindenberg has formulated and written discharge instructions for cervical spine conditions.

In her report, Lindenberg states that on October 22, 2016, Stewart was in a "bicycle accident" while wearing a helmet. He was transported to Clear Lake Regional by ambulance in "critical condition," with a chief complaint of "neck pain." (Internal quotations omitted.) He was admitted to the hospital. CT scans of Stewart's pelvis, chest, and spine revealed certain findings:

- "A 40% right anterior apical pneumothorax of the lung";

- "Bilateral clavicular fractures";

- "Multiple right rib fractures (1st, 2nd, 4th, 5th, and 7th)";

- "Lumbar 5-Sacral 1 degenerative disc disease"; and

- "Cervical 4-7 disc narrowing, cervical 5-7 osteoarthritis and spinal stenosis."

Stewart was discharged from Clear Lake Regional on October 25, 2016 by nurse practitioner Breaux. At the time of discharge, Stewart had an outpatient clavicular surgery scheduled. Nurse practitioner Breaux wrote the following discharge assessment: "Medically stable for discharge home with outpatient follow up" and "[t]ertiary trauma survey was negative for missed or occult trauma." (Internal quotations omitted.) Nurse practitioner Breaux's discharge instructions to Stewart included: "Follow up with orthopedist as scheduled," " [f]ollow up in clinic

in two weeks – call for appointment," "[p]resent to [emergency department]/911 . . . with worsening symptoms," and "[a]ctivity as tolerated, nonstrenuous." (Internal quotations omitted.)

On October 27, 2016, Stewart had outpatient open reduction and internal fixation ("ORIF") surgery on his right clavicle. He attended follow up orthopedic visits on November 16, 2016, December 14, 2016, and January 25, 2017. At the January 25, 2017 follow up visit, Stewart had continuing upper extremity weakness, was prescribed strengthening physical therapy, and was given "a full activity release" and "orthopedic surgery clearance." Sometime after the January 25, 2017 orthopedic visit, Stewart was involved in a skiing accident that rendered him a quadriplegic.

As to the standard of care and breach of the standard of care for nurse practitioner Breaux, Lindenberg states that a nurse practitioner must make accurate and complete documentation of the assessment of the radiologically present cervical spine condition upon discharge, must notify the patient of the radiologically present cervical spine condition, including potential course of the disease, sequelae, and neurological warning signs and symptoms, and must provide comprehensive patient discharge education about follow up cervical spine care, precautions, activity limitations, and follow up treatment. According to Lindenberg, nurse practitioner Breaux breached the standard of care by failing to document Stewart's extensive

cervical disc disease and compromised spine upon discharge, neglecting to notify Stewart of his medical condition and potential neurological sequelae at the time of discharge, and failing to educate Stewart on the care and follow up for his unstable cervical spine at the time of discharge.

As to the standard of care for Clear Lake Regional, Lindenberg states that the hospital had to provide contractual expectations and orientation/training for providers about the required elements of discharge planning, discharge summary documentation, and patient discharge education, and it had to provide an electronic medical record template for discharge summary instructions comprised of a standard set of elements to include patient discharge education and follow up.[16]

Dr. Uzelmeier objected to Dr. DeBerardino's amended expert report and requested that Stewart's health care liability claim against him be dismissed. Dr. Uzelmeier asserted that the amended expert report does not provide a fair summary of the applicable standard of care and how Dr. Uzelmeier breached the standard of care. The report also does not establish a causal connection between Dr. Uzelmeier's alleged breach of the standard of care and Stewart's injuries. Dr. DeBerardino's opinion on causation is conclusory and speculative. Dr. DeBerardino is not qualified to offer an opinion on the standard of care as to Dr. Uzelmeier.

---

[16] Lindenberg's expert report does not provide opinions as to Drs. Uzelmeier, Madain, Norman, and Moulton.

20

Drs. Norman and Moulton objected to Dr. DeBerardino's amended expert report and requested that Stewart's health care liability claim against them be dismissed. Drs. Norman and Moulton asserted that the amended expert report does not provide a fair summary of the causal relationship between the alleged breaches of the applicable standards of care by Drs. Norman and Moulton and Stewart's injuries, and Dr. DeBerardino's opinion on causation is conclusory and contains analytical gaps. Dr. DeBerardino is not qualified to offer an opinion on causation as to Drs. Norman and Moulton.

Dr. Madain objected to Dr. DeBerardino's amended expert report and requested that Stewart's health care liability claim against him be dismissed. Dr. Madain asserted that the amended expert report does not provide a fair summary of the applicable standard of care and how Dr. Madain breached the standard of care. The report also does not explain "how and why" Dr. Madain's alleged breach of the standard of care caused Stewart's injuries, and Dr. DeBerardino's opinion on causation is conclusory. (Internal quotations omitted.) Dr. DeBerardino is not qualified to offer an opinion on the standard of care as to Dr. Madain.

Clear Lake Regional objected to Dr. DeBerardino's amended expert report and requested that Stewart's health care liability claim against it be dismissed. Clear Lake Regional asserted that the amended expert report does not provide a fair summary of the applicable standard of care and how Clear Lake Regional breached

21

the standard of care. The report also does not explain how Clear Lake's alleged breach of the standard of care proximately caused Stewart's injuries, and Dr. DeBerardino's opinion on causation is conclusory. Clear Lake Regional asserted that Dr. DeBerardino is not qualified to offer an opinion on the standard of care as to Clear Lake Regional.

Clear Lake Regional objected to Lindenberg's report and requested that Stewart's health care liability claim against it be dismissed. Clear Lake asserted that Lindenberg's report does not provide a fair summary of the applicable standard of care and how Clear Lake Regional breached the standard of care. Clear Lake Regional asserted that Lindenberg's expert report only pertained to nurse practitioner Breaux and the report constitutes no report as to Clear Lake Regional. Additionally, Lindenberg, as a nurse practitioner, is not qualified to offer an opinion on causation.

Nurse practitioner Breaux objected to Dr. DeBerardino's amended expert report and requested that Stewart's health care liability claim against her be dismissed. Nurse practitioner Breaux asserted that the amended expert report does not provide a fair summary of the causal relationship between nurse practitioner Breaux's alleged breach of the standard of care and Stewart's injuries and Dr. DeBerardino's opinion on causation is conclusory. Dr. DeBerardino is not qualified to offer an opinion on causation as to nurse practitioner Breaux.

22

Nurse practitioner Breaux objected to Lindenberg's report and requested that Stewart's health care liability claim against her be dismissed because Lindenberg, as a nurse practitioner, is not qualified to offer an opinion on causation.

After Stewart responded[17] to appellants' objections and motions to dismiss, the trial court, in multiple orders, overruled appellants' objections to Dr. DeBerardino's amended expert report and Lindenberg's expert report and denied appellants' motions to dismiss the health care liability claims against them.

## Standard of Review

We review a trial court's decision on a motion to dismiss a health care liability claim for an abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 858 (Tex. App.—Houston [1st Dist.] 2006, no pet.). We apply the same standard to a trial court's determination that an expert is qualified. *See Broders v. Heise*, 924 S.W.2d 148, 151–52 (Tex. 1996); *San Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 811 (Tex. App.—Houston [14th Dist.] 2008, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). When reviewing matters committed to a trial court's discretion, we may not substitute our own judgment for that of the trial court. *Bowie Mem'l*

---

[17] Certain replies and sur-replies were also filed by the parties.

*Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *Harris Cty. Hosp. Dist. v. Garrett*, 232 S.W.3d 170, 176 (Tex. App.—Houston [1st Dist.] 2007, no pet.). But a trial court has no discretion in determining what the law is or in applying the law to the facts. *See Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). In conducting our review, we always consider that the Legislature's goal in requiring expert reports is to deter baseless claims, not block earnest ones. *Jackson v. Kindred Hosps. Ltd. P'ship*, 565 S.W.3d 75, 81 (Tex. App.—Fort Worth 2018, pet. denied); *Gonzalez v. Padilla*, 485 S.W.3d 236, 242 (Tex. App.—El Paso 2016, no pet.); *see also Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011).

Under the Texas Medical Liability Act ("TMLA"), a plaintiff asserting a health care liability claim must timely serve each defendant physician and health care provider[18] with at least one expert report, with a CV for the expert whose opinion is offered, to substantiate the merits of the plaintiff's claim. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (i); *see also Mangin v. Wendt*, 480 S.W.3d 701, 705

---

[18] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(12)(A) ("[h]ealth care provider" means "any person, partnership, professional association, corporation, facility, or institution duly licensed, certified, registered, or chartered by the State of Texas to provide health care, including: . . . a registered nurse . . . [and] a health care institution" (internal quotations omitted)); *see also id.* § 74.001(a)(11)(G) ("[h]ealth care institution" includes "a hospital" (internal quotations omitted)).

(Tex. App.—Houston [1st Dist.] 2015, no pet.). The expert report must provide a "fair summary" of the expert's opinions on (1) the applicable standard of care, (2) the manner in which the care rendered by the defendant physician or health care provider failed to meet the standard of care, and (3) the causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *see also Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013). A "fair summary" of the expert's opinions means that, at the least, the report must state more than the expert's mere conclusions on the standard of care, breach, and causation; it must instead explain the basis of the expert's opinion so as to link the conclusions to the facts of the case. *See Jelinek*, 328 S.W.3d at 539; *Wright*, 79 S.W.3d at 52.

If a plaintiff fails to timely serve an expert report, then, on the motion of a defendant physician or health care provider, the trial court must dismiss the pertinent health care liability claim with prejudice and award attorney's fees. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b); *Baty v. Futrell*, 543 S.W.3d 689, 692 (Tex. 2018). But if a plaintiff timely serves an expert report and a defendant physician or health care provider files a motion challenging the adequacy of that report, then the trial court may only grant the motion "if it appears to the court, after [a] hearing, that the report does not represent an objective good faith effort to comply with the [TMLA's] definition of an expert report." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l);

25

*Baty*, 543 S.W.3d at 692–93; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) ("[e]xpert report" means "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed" (internal quotations omitted)).

An expert report qualifies as an "objective good faith effort" to avoid dismissal if it discusses each element with sufficient specificity so that it (1) informs the defendant physician or health care provider of the specific conduct that the plaintiff questions or about which the plaintiff complains and (2) provides a basis for the trial court to conclude that the plaintiff's health care liability claim has merit. *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 513 (Tex. 2017); *see also Baty*, 543 S.W.3d at 693–94. The expert report need not use any particular words, and it may be informal, "but bare conclusions will not suffice." *Scoresby*, 346 S.W.3d at 555–56.

In determining whether an expert report constitutes an "objective good faith effort" to address each element, "a trial court may not draw inferences; instead, it must exclusively rely upon the information contained within the four corners of the report." *Puppala v. Perry*, 564 S.W.3d 190, 197 (Tex. App.—Houston [1st Dist.]

26

2018, no pet.) (internal quotations omitted). And when the issue of adequacy hinges on an expert's qualifications, the trial court may also consider the "four corners" of the expert's CV. *Id.*; *Mangin*, 480 S.W.3d at 706. Courts must view the report in its entirety, rather than isolating specific portions or sections, to determine whether it is sufficient. *See Baty*, 543 S.W.3d at 694; *see, e.g.*, *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 144 (Tex. 2015); *see also Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 282 (Tex. App.—Austin 2007, no pet.) ("The form of the report and the location of the information in the report are not dispositive."). In reviewing the adequacy of an expert report, a trial court may not consider an expert's credibility, the data relied on by the expert, or the documents that the expert failed to consider at this pre-discovery stage of the litigation. *See Mettauer v. Noble*, 326 S.W.3d 685, 691–92 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *Gonzalez*, 485 S.W.3d at 245.

Multiple expert reports may be considered together in determining whether a plaintiff has provided a report meeting the statutory requirements. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i); *Salias v. Tex. Dep't of Aging & Disability Servs.*, 323 S.W.3d 527, 534 (Tex. App.—Waco 2010, pet. denied); *Walgreen Co. v. Hieger*, 243 S.W.3d 183, 186 n.2 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). A single report addressing both liability and causation issues related to a defendant physician or health care provider is not required. *See* TEX. CIV. PRAC. &

REM. CODE ANN. § 74.351(i); *Gannon v. Wyche*, 321 S.W.3d 881, 896 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). But the multiple expert reports, when read together, must provide a "fair summary" of the expert's opinions on (1) the applicable standard of care, (2) the manner in which the care rendered by the defendant physician or health care provider failed to meet the standard of care, and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i), (r)(6); *see also Gannon*, 321 S.W.3d at 896.

### Drs. Uzelmeier, Madain, Norman, and Moulton

In a portion of his first issue, Dr. Uzelmeier argues that the trial court erred in overruling his objections to Dr. DeBerardino's amended expert report and denying his motion to dismiss Stewart's health care liability claim against him because Dr. DeBerardino's report does not adequately address causation related to Dr. Uzelmeier. The amended expert report fails to establish how Dr. Uzelmeier's allegedly negligent acts or omissions proximately caused, or were a substantial factor in causing, Stewart's injuries. The amended expert report contains analytical gaps between Dr. DeBerardino's assertion that Dr. Uzelmeier breached the standard of care and Stewart's injuries, and it does not provide an opinion on how Stewart's injuries were foreseeable.

28

In a portion of his sole issue, Dr. Madain argues that the trial court erred in overruling his objections to Dr. DeBerardino's amended expert report and denying his motion to dismiss Stewart's health care liability claim against him because Dr. DeBerardino's report does not adequately address causation related to Dr. Madain. The amended expert report does not establish a causal link between Dr. Madain's allegedly negligent acts or omissions and Stewart's injuries. Still yet, Stewart's injuries were too far attenuated, and the amended expert report does not explain how Dr. Madain's alleged negligence in not informing Stewart of his mid and lower cervical degenerative disc disease and in not being a patient advocate more likely than not resulted in the injuries Stewart sustained in a skiing accident more than three months after he received the medical care provided by Dr. Madain.

In their first issue, Drs. Norman and Moulton argue that the trial court erred in overruling their objections to DeBerardino's amended expert report and denying their motions to dismiss Stewart's health care liability claim against them because Dr. DeBerardino's report does not adequately address causation related to Drs. Norman and Moulton. The amended expert report fails to set forth how their allegedly negligent acts or omissions proximately caused, or were a substantial factor in causing, Stewart's injuries, does not discuss how Stewart's alleged skiing accident and injuries occurred, and contains analytical gaps.

An expert report must provide a "fair summary" of the expert's opinion on the causal relationship between the failure of a defendant physician to provide care in accord with the applicable standard of care and the plaintiff's claimed injury, harm, or damages. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *see also Potts*, 392 S.W.3d at 630. The expert report must explain how and why the defendant physician's breach of the standard of care proximately caused the plaintiff's injury. *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 459–60 (Tex. 2017). An expert report need not marshal all the plaintiff's proof necessary to establish causation at trial, and it need not anticipate or rebut all possible defensive theories that may ultimately be presented to the trial court. *Wright*, 79 S.W.3d at 52; *Cornejo v. Hilgers*, 446 S.W.3d 113, 123 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). But an expert cannot simply opine that the breach caused the injury. *Jelinek*, 328 S.W.3d at 539.

Causation consists of two components: (1) cause-in-fact and (2) foreseeability. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). A defendant physician's breach was a cause-in-fact of the plaintiff's injury if the breach was a substantial factor in bringing about the harm, and absent the breach the harm would not have occurred. *Id.* Even if the harm would not have occurred absent the defendant physician's breach, "the connection between the defendant and the plaintiff's injuries simply may be too attenuated" for the breach to qualify as a

30

substantial factor. *Allways Auto Grp., Ltd. v. Walters*, 530 S.W.3d 147, 149 (Tex. 2017) (internal quotations omitted). A breach is not a substantial factor if it "does no more than furnish the condition that makes the plaintiff's injury possible." *Id.* A defendant physician's breach is a foreseeable cause of the plaintiff's injury if physician of ordinary intelligence would have anticipated the danger caused by the negligent act or omission. *Puppala*, 564 S.W.3d at 197.

In his amended expert report, Dr. DeBerardino states that Stewart was involved in a "bicycle incident" and admitted to Clear Lake Regional. He was provided medical care by Drs. Uzelmeier, Madain, Norman, and Moulton, among others. After Stewart was discharged from Clear Lake Regional, another physician from another hospital, who is not a party to this appeal, performed surgery on Stewart to repair Stewart's bicycle-incident injuries. Stewart then resumed his normal athletic activities. Later, Stewart broke his neck and injured his spinal cord, rendering him a quadriplegic.

Lindenberg's report, which Dr. DeBerardino incorporates in his amended expert report, provides slightly more information about Stewart's eventual injuries. Lindenberg states that Stewart was involved in a "bicycle accident" and was taken to the emergency room at Clear Lake Regional. Five days after the bicycle accident, and two days after being discharged from Clear Lake Regional, Stewart had outpatient ORIF surgery on his right clavicle. Another physician from another

31

hospital, who is not a party to this appeal, performed that surgery. Stewart attended follow up orthopedic visits after his surgery on November 16, 2016, December 14, 2016, and January 25, 2017. On January 25, 2017, Stewart's other physician gave him "a full activity release" and "orthopedic surgery clearance." Sometime later, Stewart was involved in a skiing accident that rendered him a quadriplegic.

According to Dr. DeBerardino, Drs. Uzelmeier, Madain, Norman, and Moulton all breached the purportedly applicable standards of care in the same manner—by failing to inform Stewart, while he was at Clear Lake Regional being treated for injuries related to the bicycle incident, that he had extensive mid and lower cervical degenerative disc disease and by failing to be patient advocates and inform Stewart of the serious consequences of that condition—a condition unrelated to the injuries Stewart sustained in the bicycle incident.

The amended expert report also states that the alleged breaches of the standard of care by Drs. Uzelmeier, Madain, Norman, and Moulton caused Stewart's subsequent neck and spinal injuries, but Dr. DeBerardino does not provide many facts about how Stewart allegedly sustained his skiing-related injuries or how those skiing-related injuries relate to Stewart's mid and lower cervical degenerative disc disease. Dr. DeBerardino simply states that Stewart's neck and spinal cord injuries were in the same location as his "stenosis," but Dr. DeBerardino does not link the

purported stenosis to the allegedly undisclosed extensive mid and lower cervical degenerative disc disease about which Stewart complains.[19]

Instead, Dr. DeBerardino generally opines that if the physicians had not breached the purported standards of care—by failing to inform Stewart, while he was at Clear Lake Regional, that he had extensive mid and lower cervical degenerative disc disease and by failing to be patient advocates and inform Stewart of the serious consequences of that condition—Stewart's extensive mid and lower cervical degenerative disc disease would have remained stable and not progressed. Stewart would have had the option of receiving neurosurgical consultation and care, which could have included further neurological testing, detailed cervical spine care, activity limitations, physical therapy/rehabilitation, and surgical intervention. Further, Stewart would have had surgery to correct his condition or would have been prohibited from engaging in the unspecified activities that led to his broken neck. According to Dr. DeBerardino, Stewart would have obeyed any physician's instructions to restrict his activity. Yet, because Drs. Uzelmeier, Madain, Norman, and Moulton breached the purported standards of care, Stewart continued to engage in his normal athletic activities and later suffered a broken neck and spinal cord injury during a skiing accident more than three months later. *Cf. Jelinek*, 328 S.W.3d

---

[19] Dr. DeBerardino does not state, and Stewart does not allege, that Drs. Uzelmeier, Madain, Norman, and Moulton were required to inform Stewart of his stenosis or that they breached the applicable standards of care by allegedly failing to do so.

at 533 ("Care must be taken to avoid the *post hoc ergo propter hoc* fallacy, that is, finding an earlier event caused a later event merely because it occurred first."); *Curnel v. Houston Methodist Hosp.-Willowbrook*, 562 S.W.3d 553, 565 (Tex. App.—Houston [1st Dist.] 2018, no pet.) ("It is not enough that one event occurred before the other . . . .").

An expert cannot simply opine that a breach of the standard of care caused the plaintiff's injury. *Jelinek*, 328 S.W.3d at 539; *Nw. EMS Consultants, P.A. v. Guillory*, No. 01-19-00668-CV, 2020 WL 4516872, at \*12 (Tex. App.—Houston [1st Dist.] Aug. 6, 2020, pet. denied); *see also Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 224 (Tex. 2008) ("A conclusory statement of causation is inadequate . . . ."). And an expert's conclusion that "in medical probability" one event caused another is no more than an expert's simple *ipse dixit*, which is insufficient to establish causation. *Jelinek*, 328 S.W.3d at 539–40 (internal quotations omitted); *see also City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009). Here, Dr. DeBerardino's amended expert report offers no more than a bare assertion that the purported breaches by Drs. Uzelmeier, Madain, Norman, and Moulton resulted in the later injuries Stewart sustained while skiing. *See Jelinek*, 328 S.W.3d at 539–40 (bare assertion that breach resulted in increased pain, suffering, and prolonged hospital stay was inadequate); *Guillory*, 2020 WL 4516872, at \*12. Dr. DeBerardino does not explain how the named-defendant

34

physicians' purported breaches *caused* Stewart's skiing-related injuries. *See Jelinek*, 328 S.W.3d at 540; *see also THN Physicians Ass'n v. Tiscareno*, 495 S.W.3d 599, 614 (Tex. App.—El Paso 2016, no pet.) ("[T]he expert must at a minimum explain the connection between [the physician's] conduct and the injury to the [plaintiff]."). "A report that merely states [an] expert's conclusions about . . . causation" does not fulfill the purposes of requiring a good-faith effort. *Palacios*, 46 S.W.3d at 879.

Further, an event that starts a chain of events can be too attenuated from an injury to cause it. *See Providence Health Ctr. v. Dowell*, 262 S.W.3d 324, 329–30 (Tex. 2008) (holding medical providers' "negligence was too attenuated from the [harm] to have been a substantial factor in bringing it about"); *Curnel*, 562 S.W.3d at 565; *Shenoy v. Jean*, No. 01-10-01116-CV, 2011 WL 6938538, at *9 (Tex. App.— Houston [1st Dist.] Dec. 29, 2011, pet. denied) (mem. op.) ("A causal link can be too attenuated to satisfy the causation requirement for an expert report."). It is not enough that one event occurred before the other. *Curnel*, 562 S.W.3d at 565; *Shenoy*, 2011 WL 6938538, at *9; *see Jelinek*, 328 S.W.3d at 533 ("Care must be taken to avoid the *post hoc ergo propter hoc* fallacy, that is, finding an earlier event caused a later event merely because it occurred first."). An event is not a substantial factor in bringing about the harm if it is "too attenuated" from the harm or "does no more than furnish the condition that makes the plaintiff's injury possible." *Walters*, 530 S.W.3d at 149; *see also Curnel*, 562 S.W.3d at 565.

Here, the named-defendant physicians' purported breaches of the standards of care—that were committed when Stewart was admitted to Clear Lake Regional for injuries related to a "bicycle incident"—are too attenuated from Stewart's later neck and spinal injuries sustained while skiing to be considered a substantial factor in bringing about those skiing-related injuries. *See Curnel*, 562 S.W.3d at 565–66. The purported breaches by Drs. Uzelmeier, Madain, Norman, and Moulton in failing to inform Stewart that he had extensive mid and lower cervical degenerative disc disease and failing to be patient advocates and inform Stewart of the serious consequences of that condition when Stewart was admitted to Clear Lake Regional for injuries related to his bicycle incident, at most, did "no more than furnish the condition" that made Stewart's later injuries while skiing possible. *Cf. Curnel*, 562 S.W.3d at 565–66 (internal quotations omitted); *see also IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 800 (Tex. 2004) ("Our precedents establish that merely creating the condition that makes harm possible falls short as a matter of law of satisfying the substantial factor test.").

We conclude that Dr. DeBerardino's amended expert report does not adequately inform Drs. Uzelmeier, Madain, Norman, and Moulton of the causal relationship between their purported failures to provide care in accord with the applicable standards of care and the claimed injury, harm, or damages. Thus, we

36

hold that the trial court erred in overruling the objections and denying the motions to dismiss of Drs. Uzelmeier, Madain, Norman, and Moulton.[20]

We sustain this portion of Dr. Uzelmeier's first issue, this portion of Dr. Madain's sole issue, and Drs. Norman and Moulton's first issue.

### Nurse Practitioner Breaux

In her second issue, nurse practitioner Breaux argues that the trial court erred in overruling her objections to Dr. DeBerardino's amended expert report and denying her motion to dismiss Stewart's health care liability claim against her because Dr. DeBerardino is not qualified to render an expert opinion on causation related to nurse practitioner Breaux.

An expert report by a person not qualified to testify does not constitute a good-faith effort to comply with the TMLA's definition of an expert report and warrants dismissal. *See Mettauer*, 326 S.W.3d at 693; *Hendrick Med. Ctr. v. Conger*, 298 S.W.3d 784, 789 (Tex. App.—Eastland 2009, no pet.) (where expert

---

[20] Stewart cannot rely on Lindenberg's expert report to address the causal relationship between the purported failures to provide care in accord with the applicable standards of care by Drs. Uzelmeier, Madain, Norman, and Moulton and the claimed injury, harm, or damages. Lindenberg's expert report does not discuss the named-defendant physicians, and under Texas Civil Practice and Remedies Code section 74.403, only physicians are qualified to render causation opinions in suits involving health care liability claims. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.403(a); *Walgreen Co. v. Hieger*, 243 S.W.3d 183, 186 n.2 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). Lindenberg, a nurse practitioner, is not a physician. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(23) (defining "[p]hysician" (internal quotations omitted)). In his briefing, Stewart states that Lindenberg's report "is not offered for purposes of establishing causation."

37

not qualified to render opinion, expert report is rendered deficient); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l), (r)(6). Whether an expert witness is qualified to offer an expert opinion lies within the sound discretion of the trial court. *Cornejo*, 446 S.W.3d at 121. The expert's qualifications must appear in the four corners of the expert report or in the expert's accompanying CV. *Puppala*, 564 S.W.3d at 197, 202; *see also Cornejo*, 446 S.W.3d at 121.

To be qualified to opine on the causal relationship between a defendant health care provider's alleged failure to meet an applicable standard of care and the plaintiff's claimed injury, harm, or damages, the author of an expert report must be a physician who is qualified to render opinions on such causal relationships under the Texas Rules of Evidence. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.403(a); *see id.* § 74.351(r)(5)(C) ("[e]xpert" means "with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim, a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence" (internal quotations omitted)); *Cornejo*, 446 S.W.3d at 120.

An expert witness may be qualified on the basis of knowledge, skill, experience, training, or education to testify on scientific, technical, or other specialized subjects if the testimony would "assist the trier of fact" in understanding

the evidence or determining a fact issue. *Cornejo*, 446 S.W.3d at 121 (internal quotations omitted); *see* TEX. R. EVID. 702. Thus, a plaintiff must show that his expert has "knowledge, skill, experience, training, or education" about the specific issue before the court that would qualify the expert to give an opinion on that particular subject. *Broders*, 924 S.W.2d at 153–54 (internal quotations omitted); *see also Cornejo*, 446 S.W.3d at 121.

Not every licensed physician is qualified to testify on every medical question. *See Broders*, 942 S.W.2d at 152–53; *Cornejo*, 446 S.W.3d at 121. Yet, a physician need not practice in the particular field about which he is testifying so long as he can demonstrate that he has knowledge, skill, experience, training, or education about the specific issue before the court that would qualify him to give an opinion on that subject. *Cornejo*, 446 S.W.3d at 121. Simply put, what is required is that the physician demonstrate that he is qualified to opine on the specific issue before the court. *Puppala*, 564 S.W.3d at 202.

Nurse practitioner Breaux argues that Dr. DeBerardino is not qualified to render an expert opinion on causation because he is an orthopedic surgeon and his primary practice is orthopedic surgery and sports medicine.

Dr. DeBerardino is a licensed physician and a board-certified orthopedic surgeon. He also holds a certificate of additional qualification in sports medicine. He primarily practices in the areas of orthopedic surgery and sports medicine.

39

Currently, he is a practicing orthopedic surgeon. Dr. DeBerardino is the clinical professor of orthopedic surgery at Baylor College of Medicine at the San Antonio Orthopedic Group, the co-director of the Baylor College of Medicine – San Antonio Combined Texas Sports Medicine Fellowship, the Gold Cup International Soccer sports medicine consultant, the medical director for the Burkhart Research Institute of Orthopedics of the San Antonio Orthopedic Group, a practicing orthopedic surgeon at the San Antonio Orthopedic Group, and a member of the Physician Leadership Counsel for the Baptist North Central Hospital in San Antonio.

Dr. DeBerardino's medical experience also includes a military medical background. As a military physician, Dr. DeBerardino was trained in and practiced in trauma and emergency care.

As to nurse practitioner Breaux, Dr. DeBerardino states that he, an orthopedic surgeon, is qualified to opine on the *standard of care* for a nurse practitioner because he was the chief of the sports medicine section of the orthopedic surgery service at Brooke Army Medical Center, the chief of orthopedic surgery at the 801st Combat Support Hospital, and the chief of the orthopedic surgery service at Keller Army Hospital, and as such, he directed hospital staff regularly.[21] But Dr. DeBerardino

---

[21] We express no opinion on whether Dr. DeBerardino is qualified to opine on the *standard of care* for a nurse practitioner.

does not specifically set forth why he is qualified to opine on causation as it relates to nurse practitioner Breaux.

In his first amended petition, Stewart alleges that appellants, including nurse practitioner Breaux, were negligent in failing to inform Stewart of his cervical disc disease and failing to adequately document that condition. Stewart thus had the burden of establishing that Dr. DeBerardino had "knowledge, skill, experience, training, or education" about whether those allegedly negligent acts or omissions caused Stewart's claimed injury, harm, or damages resulting from his subsequent skiing accident. *See Matagorda v. Nursing & Rehab. Ctr., L.L.C. v. Brooks*, No. 13-16-00266-CV, 2017 WL 127867, at *6 (Tex. App.—Corpus Christi–Edinburg Jan. 12, 2017, no pet.) (mem. op.) (internal quotations omitted); *Diagnostic Research Grp. v. Vora*, 473 S.W.3d 861, 869–70 (Tex. App.—San Antonio 2015, no pet.); *see also Cornejo*, 446 S.W.3d at 121 (plaintiffs required to establish expert qualified on basis of knowledge, skill, experience, training, or education to offer opinion on causal link between alleged breaches of standard of care and injuries suffered); *Mem'l Hermann Healthcare Sys. v. Burrell*, 230 S.W.3d 755, 762 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (party offering witness as expert must establish witness is qualified).

In his amended expert report, Dr. DeBerardino states that Stewart, after a skiing accident, broke his neck and injured his spinal cord, rendering him a

quadriplegic. But nothing in his expert report or CV addresses whether, or how, his knowledge, skill, experience, training, or education in orthopedic surgery, sports medicine, and trauma and emergency care, qualify him to opine on whether nurse practitioner Breaux's alleged breach of the standard of care—by failing to inform Stewart of his cervical disc disease and failing to adequately document that condition while he was admitted to Clear Lake Regional more than three months before his skiing accident—caused Stewart's skiing-related injuries. *See Broders*, 924 S.W.2d at 153 ("[W]e [focus] on whether the expert's expertise goes to the very matter on which he or she is to give an opinion."); *Estorque v. Schafer*, 302 S.W.3d 19, 26 (Tex. App.—Fort Worth 2009, no pet.) ("Qualifications must appear in the expert report [and CV] and cannot be inferred."); *Palafox v. Silvey*, 247 S.W.3d 310, 316 (Tex. App.—El Paso 2007, no pet.) ("In deciding whether an expert is qualified, the trial court must ensure those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion." (internal quotations omitted)); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.403(a) (expert must be qualified to opine on causal relationship between defendant health care provider's alleged failure to meet applicable standard of care and plaintiff's claimed injury, harm, or damages). We may not fill in gaps in Dr. DeBerardino's report and CV where he fails to detail why or how he is qualified to offer an opinion on causation as it relates to nurse practitioner Breaux. *See Concentra Health Servs.,*

42

*Inc. v. Everly*, No. 2-08-455-CV, 2010 WL 1267775, at \*6 (Tex. App.—Fort Worth Apr. 1, 2010, no pet.) (mem. op.).

In his briefing, Stewart generally asserts that Dr. DeBerardino is qualified to offer opinions about causation because as an orthopedic surgeon he "sees patients suffering from the condition at issue in this case" and he "often treat[s] patients such as . . . Stewart who have extensive mid to lower cervical degenerative disc disease." (First alteration in original.) (Internal quotations omitted.)

But, here, Dr. DeBerardino's amended expert report and CV do not demonstrate that he has expertise on the actual subject about which Stewart is offering Dr. DeBarardino's opinion. *See Burrell*, 230 S.W.3d at 762; *see also Guillory*, 2020 WL 4516872, at \*10. And even though Dr. DeBerardino may have training and experience in the area of orthopedic surgery, nothing indicates that he has the knowledge, skill, experience, training, or education in determining whether the purportedly negligent acts or omissions of nurse practitioner Breaux—failing to inform Stewart of his cervical disc disease and failing to adequately document that condition while he was admitted to Clear Lake Regional more than three months before his complained-of skiing-related injuries—can cause the broken neck and spinal injury seen in Stewart after his skiing accident. *See Guillory*, 2020 WL 4516872, at \*10; *Puppala*, 564 S.W.3d at 202 (physician must be able to demonstrate that he is qualified to opine on the specific issue before court); *see also*

43

*Broders*, 924 S.W.2d at 152–53 ("[T]here is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question.").

We conclude that Dr. DeBerardino's expert report and CV do not establish that he is qualified to opine on causation as it relates to nurse practitioner Breaux. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.403(a); *see also Conger*, 298 S.W.3d 789 (where expert not qualified to render opinion, expert report is deficient).

We note that Stewart cannot rely on the expert report of Lindenberg, a non-physician, to address the causal relationship between the purported failure of nurse practitioner Breaux to provide care in accord with the applicable standard of care and Stewart's claimed injury, harm, or damages. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.403(a); *Hieger*, 243 S.W.3d at 186 n.2. Under Texas Civil Practice and Remedies Code section 74.403, only physicians are qualified to render causation opinions in suits involving health care liability claims. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.403(a); *Hieger*, 243 S.W.3d at 186 n.2. Lindenberg, a nurse practitioner, is not qualified to render an opinion on causation.[22] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(23) (defining "[p]hysician" (internal quotations omitted)).

---

[22] In his briefing, Stewart states that Lindenberg's report "is not offered for purposes of establishing causation and any references to causation in the report are mere surplusage."

44

Thus, we hold that the trial court erred in overruling nurse practitioner Breaux's objections and denying her motion to dismiss Stewart's health care liability claim against her.

We sustain nurse practitioner Breaux's second issue.

## Clear Lake Regional

In its sole issue, Clear Lake Regional argues that the trial court erred in overruling its objections to Dr. DeBerardino's amended expert report and denying its motion to dismiss Stewart's health care liability claim against it because Stewart did not allege that Clear Lake Regional was vicariously liable for the negligent acts or omissions of Drs. Uzelmeier, Norman, Moulton, and Madain and nurse practitioner Breaux, Dr. DeBerardino's report does not adequately address the standard of care, breach of the standard of care, or causation related to the direct liability of Clear Lake Regional, and Dr. DeBerardino is not qualified to offer an opinion on the standard of care and breach of the standard of care related to Clear Lake Regional. Clear Lake Regional also argues that the trial court erred in overruling its objections to Lindenberg's expert report and denying its motion to dismiss Stewart's health care liability claim against it because Lindenberg, as a nurse practitioner, is not qualified to offer an opinion on causation.

## A.    Vicarious Liability

In a portion of its sole issue, Clear Lake Regional argues that the trial court erred in overruling its objections to Dr. DeBerardino's amended expert report and denying its motion to dismiss Stewart's health care liability claim against it because Stewart did not allege in his first amended petition that the hospital was vicariously liable for the purportedly negligent acts and omissions of Drs. Uzelmeier, Norman, Moulton, and Madain and nurse practitioner Breaux. Instead, Stewart only alleged "a vague vicarious liability allegation" that did not inform Clear Lake Regional that Stewart sought to hold it vicariously liable for the allegedly negligent conduct of Drs. Uzelmeier, Norman, Moulton, and Madain and nurse practitioner Breaux. And, as such, the vague vicarious liability health care claim is insufficient to impute Dr. DeBerardino's expert opinions against the named-defendant physicians and nurse practitioner Breaux to Clear Lake Regional.

In his briefing, Stewart asserts that his first amended petition alleges that Clear Lake Regional is vicariously liable for the allegedly negligent acts or omissions of Drs. Uzelmeier, Norman, Moulton, and Madain and nurse practitioner Breaux. Stewart does not assert that his pleadings allege that Clear Lake Regional is vicariously liable for the acts and omissions of anyone other than the named-defendant physicians and nurse practitioner Breaux. Thus, Stewart argues that because Dr. DeBerardino's amended expert report adequately addresses the

46

standards of care, breaches of the standard of care, and causation as to Drs. Uzelmeier, Norman, Moulton, and Madain and nurse practitioner Breaux, the trial court did not err in overruling Clear Lake Regional's objections to Dr. DeBerardino's amended expert report and denying Clear Lake Regional's motion to dismiss.

Generally, when a plaintiff brings health care liability claims against more than one defendant physician or health care provider, the expert report must set forth the standard of care and breach of the standard of care as to each defendant and explain the causal relationship between each defendant's individual acts or omissions and the claimed injury. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (r)(6); *Seton Family of Hosps. v. White*, 593 S.W.3d 787, 793 (Tex. App.—Austin 2019, pet. denied); *Pharmacy Healthcare Sols., Ltd. v. Pena*, 530 S.W.3d 169, 175 (Tex. App.—Eastland 2015, pet. denied). Yet, when a plaintiff brings a health care liability claim based on a vicarious liability theory against a defendant health care provider, an expert report that adequately implicates the actions of that party's agent or employee is sufficient. *Gardner v. U.S. Imaging, Inc.*, 274 S.W.3d 669, 671–72 (Tex. 2008); *Seton Family*, 593 S.W.3d at 792; *see also Owens v. Handyside*, 478 S.W.3d 172, 191 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) ("[W]hen a health care liability claim involves a vicarious liability theory, either alone or in combination with other theories, an expert report that meets

47

the statutory standards as to the employee is sufficient to implicate the employer's conduct under the vicarious theory." (alteration in original) (internal quotations omitted)). In other words, when a health care liability claim against a defendant health care provider is based on vicarious liability, an expert report that meets the statutory standards as to an agent or employee is sufficient to implicate the health care provider's conduct. *Potts*, 392 S.W.3d at 632; *Seton Family*, 593 S.W.3d at 792.

Here, we presume, as Stewart asserts, that his first amended petition is sufficient to allege that Clear Lake Regional is vicariously liable for the allegedly negligent conduct of Drs. Uzelmeier, Norman, Moulton, and Madain and nurse practitioner Breaux.[23] Yet, as discussed above, we have concluded that Dr. DeBerardino's amended expert report is deficient as to Drs. Uzelmeier, Norman, Moulton, and Madain and nurse practitioner Breaux for various reasons. Thus, because Dr. DeBerardino's amended expert report does not meet the statutory

---

[23] We note that if Stewart's pleadings were insufficient as to the legal nexus establishing Clear Lake Regional's vicarious liability for the allegedly negligent acts or omissions of Drs. Uzelmeier, Norman, Moulton, and Madain and nurse practitioner Breaux, the appropriate remedy would have been for Clear Lake Regional to challenge Stewart's pleadings, not Dr. DeBerardino's expert report. *See Seton Family of Hosps. v. White*, 593 S.W.3d 787, 794 (Tex. App.—Austin 2019, pet. denied); *see also* TEX. R. CIV. P. 91 (providing for special exceptions to pleadings), 91a (providing for dismissal of cause of action that has no basis in law or fact). Clear Lake Regional did not challenge Stewart's pleadings in this case. *See Seton Family*, 593 S.W.3d at 794.

standards as to the named-defendant physicians and nurse practitioner Breaux—the individuals whose purportedly negligent acts or omissions serve as the basis for Stewart's vicarious liability health care liability claim against Clear Lake Regional—we conclude that Dr. DeBerardino's amended expert report is also deficient as to Clear Lake Regional on Stewart's vicarious liability health care liability claim.[24]

We must now consider whether Dr. DeBerardino's amended expert report is sufficient as to Stewart's direct liability claim against Clear Lake Regional. *See Potts*, 392 S.W.3d at 630 ("A report that satisfies the[] requirements, even if as to one theory only, entitles the claimant to proceed with a suit against the [defendant] physician or health care provider."); *Whitmire v. Feathers*, No. 01-19-00094-CV, 2020 WL 4983321, at *21 (Tex. App.—Houston [1st Dist.] Aug. 25, 2020, no pet.)

---

[24] We have already explained why Stewart cannot rely on the expert report of Lindenberg, a non-physician, to support his claims against Drs. Uzelmeier, Madain, Norman, and Moulton and nurse practitioner Breaux. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.403(a); *Hieger*, 243 S.W.3d at 186 n.2; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(23) (defining "[p]hysician" (internal quotations omitted)). He also cannot rely on Lindenberg's expert report to support his vicarious liability health care liability claim against Clear Lake Regional that is based on the purportedly negligent acts and omissions of the named-defendant physicians and nurse practitioner Breaux. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.403(a); *Hieger*, 243 S.W.3d at 186 n.2 (only physicians are qualified to render causation opinion in suits involving health care liability claims). In his briefing, Stewart states that Lindenberg's report "is not offered for purposes of establishing causation and any references to causation in the report are mere surplusage."

(mem. op.) ("An expert report that adequately addresses at least one pleaded liability theory against a defendant health care provider is enough to defeat that defendant's motion to dismiss challenging the adequacy of the report.").

## B. Direct Liability

In another portion of its sole issue, Clear Lake Regional argues that the trial court erred in overruling its objections to Dr. DeBerardino's amended expert report and denying its motion to dismiss Stewart's health care liability claim against it because Dr. DeBerardino's report does not adequately address the standard of care, breach of the standard of care, and causation related to the direct liability of Clear Lake Regional.

An expert report must provide a "fair summary" of the expert's opinion on the causal relationship between the failure of a defendant health care provider to provide care in accord with the applicable standard of care and the plaintiff's claimed injury, harm, or damages. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *see also Potts*, 392 S.W.3d at 630. The expert report must explain how and why the defendant health care provider's breach of the standard of care proximately caused the plaintiff's injury. *Zamarripa*, 526 S.W.3d at 459–60. An expert cannot simply opine that the breach caused the injury. *Jelinek*, 328 S.W.3d at 539.

In the amended expert report, Dr. DeBerardino states that Stewart was involved in a "bicycle incident" and admitted to Clear Lake Regional. He was

50

provided medical care by Drs. Uzelmeier, Madain, Norman, and Moulton and nurse practitioner Breaux. After Stewart was discharged from Clear Lake Regional, another physician from another hospital, who is not a party to this appeal, performed surgery on Stewart to repair his bicycle-incident injuries. Stewart then resumed his normal athletic activities. Later, Stewart broke his neck and injured his spinal cord, rendering him a quadriplegic.

Lindenberg's report, which Dr. DeBerardino incorporates in his amended expert report, states that Stewart was involved in a "bicycle accident" and was taken to the emergency room at Clear Lake Regional. Five days after the bicycle accident, and two days after being discharged from Clear Lake Regional, Stewart had outpatient ORIF surgery on his right clavicle. Another physician from another hospital, who is not a party to this appeal, performed that surgery. Stewart attended follow up orthopedic visits after his surgery on November 16, 2016, December 14, 2016, and January 25, 2017. On January 25, 2017, Stewart's other physician gave him "a full activity release" and "orthopedic surgery clearance." Sometime later, Stewart was involved in a skiing accident that rendered him a quadriplegic.

According to Dr. DeBerardino, Clear Lake Regional breached the purported standard of care by failing to have hospital employees and representatives, either its nurses or physicians, inform Stewart that he had extensive mid and lower cervical degenerative disc disease and failing to have hospital employees or representatives

51

be patient advocates and inform Stewart of the serious consequences of that condition. And Clear Lake Regional's alleged breaches of the standard of care caused Stewart's subsequent neck and spinal injuries. But Dr. DeBerardino does not provide many facts about how Stewart sustained his later skiing-related injuries or how those injuries relate to his mid and lower cervical degenerative disc disease. Dr. DeBerardino simply states that Stewart's neck and spinal cord injuries were in the same location as his "stenosis." Yet, Dr. DeBerardino does not link the purported stenosis to the undisclosed extensive mid and lower cervical degenerative disc disease.[25]

As with the named-defendant physicians, Dr. DeBerardino only generally opines that if Clear Lake had not breached the purported standard of care—by failing to have hospital employees and representatives inform Stewart that he had extensive mid and lower cervical degenerative disc disease and by failing to have hospital employees or representatives be patient advocates and inform Stewart of the serious consequences of that condition—Stewart's extensive mid and lower cervical degenerative disc disease would have remained stable and not progressed. Stewart would have had the option of receiving neurosurgical consultation and care, which

---

[25]    Dr. DeBerardino does not assert, and Stewart does not allege, that Clear Lake Regional failed to have hospital employees and representatives, either its nurses or physicians, inform Stewart of his stenosis or failed to have hospital employees or representatives be patient advocates and inform Stewart of the serious consequences of his stenosis.

52

could have included further neurological testing, detailed cervical spine care, activity limitations, physical therapy/rehabilitation, and surgical intervention. Further, Stewart would have had surgery to correct his condition or would have been prohibited from engaging in the unspecified activities that led to his broken neck. Dr. DeBerardino assumes that Stewart would have obeyed any physician's instructions to restrict his activity. Yet because Clear Lake Regional breached the purported standard of care, Stewart continued to engage in his normal athletic activities and later suffered a broken neck and spinal cord injury during a skiing accident more than three months later. *Cf. Jelinek*, 328 S.W.3d at 533 ("Care must be taken to avoid the *post hoc ergo propter hoc* fallacy, that is, finding an earlier event caused a later event merely because it occurred first."); *Curnel*, 562 S.W.3d at 565 ("It is not enough that one event occurred before the other . . . .").

As discussed above, an expert cannot simply opine that a breach of the standard of care caused the plaintiff's injury. *Jelinek*, 328 S.W.3d at 539; *Guillory*, 2020 WL 4516872, at \*12; *see also Abshire*, 563 S.W.3d at 224 ("A conclusory statement of causation is inadequate . . . ."). And an expert's conclusion that "in medical probability" one event caused another is no more than an expert's simple *ipse dixit*, which is insufficient to establish causation. *Jelinek*, 328 S.W.3d at 539–40 (internal quotations omitted); *see also Pollock*, 284 S.W.3d at 818. Here, Dr. DeBerardino's amended expert report offers no more than a bare assertion that Clear

53

Lake Regional's purported breaches resulted in the later injuries Stewart sustained while skiing. *See Jelinek*, 328 S.W.3d at 539–40 (bare assertion that breach resulted in increased pain, suffering, and prolonged hospital stay inadequate); *Guillory*, 2020 WL 4516872, at \*12. There is no explanation as to how Clear Lake Regional's purported breaches *caused* Stewart's skiing-related injuries. *See Jelinek*, 328 S.W.3d at 540; *see also Tiscareno*, 495 S.W.3d at 614 ("[T]he expert must at a minimum explain the connection between [the health care provider's] conduct and the injury to the [plaintiff]."). "A report that merely states the expert's conclusions about . . . causation" does not fulfill the purposes of requiring a good-faith effort. *Palacios*, 46 S.W.3d at 879.

Further, an event is not a substantial factor in bringing about the harm if it is "too attenuated" from the harm or "does no more than furnish the condition that makes the plaintiff's injury possible." *Walters*, 530 S.W.3d at 149; *see also Curnel*, 562 S.W.3d at 565. Here, Clear Lake Regional's purported breaches of the standard of care—that were committed while Stewart was admitted to Clear Lake Regional for injuries related to his bicycle incident—are too attenuated from Stewart's later neck and spinal injuries sustained while skiing to be considered a substantial factor in bringing those injuries about. *See Dowell*, 262 S.W.3d at 329–30 (holding medical providers' "negligence was too attenuated from the [harm] to have been a substantial factor in bringing it about"); *Curnel*, 562 S.W.3d at 565–66; *Shenoy*,

2011 WL 6938538, at \*9 ("A causal link can be too attenuated to satisfy the causation requirement for an expert report."). It is not enough that one event occurred before the other. *Curnel*, 562 S.W.3d at 565; *Shenoy*, 2011 WL 6938538, at \*9; *see Jelinek*, 328 S.W.3d at 533 ("Care must be taken to avoid the *post hoc ergo propter hoc* fallacy, that is, finding an earlier event caused a later event merely because it occurred first.").

At most, Clear Lake Regional's purported breaches—by failing to have hospital employees and representatives inform Stewart that he had extensive mid and lower cervical degenerative disc disease and by failing to have hospital employees or representatives be patient advocates and inform Stewart of the serious consequences of that condition—did "no more than furnish the condition" that made Stewart's later injury while skiing possible. *Cf. Curnel*, 562 S.W.3d at 565–66 (internal quotations omitted); *see also Mason*, 143 S.W.3d at 800 ("Our precedents establish that merely creating the condition that makes harm possible falls short as a matter of law of satisfying the substantial factor test.").

As to Stewart's direct liability claim against Clear Lake Regional, we conclude that Dr. DeBerardino's amended expert report does not adequately inform Clear Lake Regional of the causal relationship between its purported failure to

provide care in accord with the applicable standard of care and the claimed injury, harm, or damages.[26]

Because Dr. DeBerardino's amended expert report is inadequate on Stewart's direct liability and vicarious liability health care liability claims against Clear Lake Regional and Stewart cannot rely on Lindenberg's expert report to support his direct liability and vicarious liability health care liability claims against Clear Lake Regional, we hold that the trial court erred in overruling Clear Lake Regional's objections and denying its motion to dismiss. *See Potts*, 392 S.W.3d at 630; *Whitmire*, 2020 WL 4983321, at *21.

We sustain Clear Lake Regional's sole issue.[27]

---

[26] We note that Stewart, as to his direct liability claim against Clear Lake Regional, cannot rely on the expert report of Lindenberg, a non-physician, to address the causal relationship between Clear Lake Regional's purported failure to provide care in accord with the applicable standard of care and Stewart's claimed injury, harm, or damages. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.403(a) (only physicians are qualified to render causation opinions in suits involving health care liability claims); *Hieger*, 243 S.W.3d at 186 n.2; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(23) (defining "[p]hysician" (internal quotations omitted)). Further, in his briefing, Stewart states that Lindenberg's report "is not offered for purposes of establishing causation and any references to causation in the report are mere surplusage."

[27] To dispose of this appeal, we need not resolve any remaining portions of appellants' issues not already addressed in this memorandum opinion. *See* TEX. R. APP. P. 47.1.

## Conclusion

We reverse the trial court's orders overruling appellants' objections and denying appellants' motions to dismiss the health care liability claims made against them. We remand this case to the trial court with instructions to assess and award appellants their reasonable attorney's fees and costs of court and to dismiss Stewart's claims against appellants with prejudice. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b).

Julie Countiss
Justice

Panel consists of Justices Countiss, Rivas-Molloy, and Guerra.